## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

LUCIANO PETROLITO, on behalf of          :
himself and all others similarly situated :
                                   :

                Plaintiff,          :     CIVIL ACTION NO.
                               :     3:02CV00484(JCH)(HBF)
vs.                                  :

ARROW FINANCIAL SERVICES, LLC    :
                                     :
                Defendant.          :     MARCH 8, 2004

### DEFENDANT'S SUPPLEMENTAL MEMORANDUM
### IN OPPOSITION TO CLASS CERTIFICATION

Defendant submits this supplemental memorandum in further opposition to plaintiff's motion for class certification, on the issue of whether the named plaintiff is an adequate representative of the proposed classes.

### I.     Plaintiff is Not An Adequate Representative of Either of the Classes He Seeks to Represent.

Plaintiff bears the burden of establishing that each of the elements of Rule 23(a) has been satisfied in order to certify a class. Caridad v. Metro North Commuter Railroad, 191 F.3d 283, 291 (2d Cir. 1999). And plaintiff bears the burden of providing sufficient information on which the court can make a determination. Pecere v. Empire Blue Cross and Blue Shield, 194 F.R.D. 66, 69 (E.D.N.Y. 2000). This requirement applies to subsection (4) of Rule 23(a) as well—plaintiff must prove that the representative party will fairly and adequately represent the interests of the class.

CARMODY & TORRANCE LLP     50 Leavenworth Street
Attorneys at Law                  Post Office Box 1110
                               Waterbury, CT 06721-1110
                               Telephone: 203 573-1200

This Court should deny the motion for class certification because plaintiff has not met his burden of presenting information or evidence from which this Court could find that the named representative meets the requirements of Rule 23(a)(4). Plaintiff's only offer on this issue is the affidavit of the named plaintiff (copy submitted herewith with deposition transcript), and the partially completed deposition testimony of the plaintiff. This record is insufficient.

The record before the court demonstrates that the named plaintiff is an inadequate class representative. Subdivision (a)(3) of 15 U.S.C. §1692k provides that the court may award " to the defendant attorney's fees reasonable in relation to the work expended and costs," on a finding that an action under the FDCPA was brought in bad faith and for the purpose of harassment. There is nothing in the record to indicate that Mr. Petrolito, the proposed representative, is aware of this possibility. Nor has plaintiff established that the proposed representative has been fully informed about other critical aspects of representing the proposed class. Therefore Mr. Petrolito cannot properly represent the interests of the proposed class and certification should be denied.

The "adequate representation" component of Rule 23 requires, among other things, that the proposed class representative demonstrate "the ability to control class counsel." Weber v. Goodman, 9. F.Supp.2d 163, 171 (E.D.N.Y. 1988), modified on other grounds, 1998 WL 180755 (citation omitted). The deposition testimony of Mr. Petrolito shows just the opposite. First, Mr. Petrolito testified that the affidavit he

CARMODY & TORRANCE LLP    50 Leavenworth Street
Attorneys at Law                        Post Office Box 1110
                                                 Waterbury, CT 06721-1110
                                                 Telephone: 203 573-1200

filed with this court in support of the motion for class certification, although sworn to by him, consists largely of words that are not his, and that he does not understand.  Mr. Petrolito testified as follows concerning the affidavit:

```
13    Q.  Did you write this document?
14    A.  No.
15    Q.  All right.  Are these your words in this
16    document?
17    A.  Not totally.
18    Q.  All right.  Which words are not totally yours?
19    A.  Well, up to -- up to here they're not mine.
20    Q.  Wait a minute.  Let's just say it so the
21    reporter can get it down.  You're pointing to
22    Paragraph 4?
23    A.  Up to Paragraph 4, yeah.
24    Q.  All the words before 4 are not yours?
25    A.  Right.
1     Q.  All right.  And then are there any other words
2     in this document that are not yours, sir?
3     A.  Yes.  5, 6, 7, 8, 9, 10, and 11.
4     Q.  And those words are not yours?
5     A.  No.
```

Transcript of Deposition of Luciano Petrolito ("Transcript") at 26-27, copy attached as Exhibit 1 (Mr. Petrolito's Affidavit was marked as Exhibit 2 at his deposition, and a copy is attached with the transcript).

In addition, although plaintiff testified that he was aware of certain of his responsibilities if he were permitted to serve as the representative of the class, his testimony makes clear that named plaintiff was uninformed about critical aspects of the role of class representative.

In this regard, Mr. Petrolito testified:

{N0714923}
CARMODY & TORRANCE LLP
Attorneys at Law
50 Leavenworth Street
Post Office Box 1110
Waterbury, CT 06721-1110
Telephone: 203 573-1200
3

12   Q.  All right.  Now, do you know what a class
13   action is?
14   A.  A class action -- from what I understand, a
15   class action is an action being brought by a person or
16   persons against a corporation.
17   Q.  Do you understand that this case, your case is
18   requested to be a class action?
19   A.  Yes.
20   Q.  All right.  And what does that mean to you in
21   your own words, Mr. Petrolito?
22   A.  What it means to me is there is -- would you
23   repeat the question, please?
24   Q.  Actually, I'm going to ask the young woman, the
25   reporter to read it back for us, so we'll get it
1    right.
2    (The requested portion was read back by the court
3    reporter.)
4    MS. FAULKNER:  What does what mean?
5    MS. RUBIN:  If you wouldn't mind reading
6    back the prior question as well, that will help
7    the witness understand it.
8    (The requested portion was read back by the court
9    reporter.)
10   BY MS. RUBIN:
11   A.  Well, I guess it means that -- that there is --
12   there is enough people out there who have been
13   wrongfully, I say, damaged by not only Arrow Financial
14   but many others, and I'm willing to stand up for them.
15   Q.  Now, do you understand that if the court
16   certifies this as a class action, you would have
17   certain responsibilities?
18   A.  Yes, I do.
19   Q.  What do you understand that those
20   responsibilities are?
21   A.  Well, I would have to keep in touch with my
22   attorneys.  Any letter -- any letters or anything else
23   that might have to be written, I would instruct my
24   attorney to do what has to be done.
25   Q.  Any other responsibilities that you understand
1    you would have if you are a class representative?
2    A.  Well, basically I'm taking responsibility for

{N0714923}

4

CARMODY & TORRANCE LLP      50 Leavenworth Street
Attorneys at Law            Post Office Box 1110
                            Waterbury, CT 06721-1110
                            Telephone: 203 573-1200

```
3      all of them.
4      Q. Any other responsibilities, Mr. Petrolito, that
5      you understand you would have as a class
6      representative?
7      A. I'm not sure.
8      Q. Okay. Can you think of anything else along the
9      lines of your responsibility that you are aware of?
10     A. No, I can't. No, I can't.
```

Transcript at 27-29.

Similarly, plaintiff testified that he understood he would be responsible for his share of costs. But his testimony made clear that he had "no idea whatsoever" what the total costs might be; nor did he know the meaning of the term "pro rata" as used in his affidavit. Transcript at 36, 37. Plaintiff's deposition testimony also made clear that he had no information whatsoever about his potential responsibility to pay any portion of defendant's costs under 15 U.S.C. §1692k(a)(3).

```
9      Q. Do you have any understanding of what -- what
10     would happen in this case if you decided for your own
11     reasons that you didn't wish to proceed?
12     A. From what I understand, I would be just
13     basically responsible for my own proportion of
14     whatever the costs would be. Other than that, I
14     don't -- I don't know anything else.
5      Q. All right. Do you have any information,
6      Mr. Petrolito, about what the arrangement is with your
7      counsel about costs in this case?
8      A. No, I do not.
9      Q. All right. Paragraph 9 of your affidavit also
10     references the cost of notification of -- notification
11     to the class. Do you see that part of 9?
12     A. Yes, I do.
```

{N0714923}

CARMODY & TORRANCE LLP
Attorneys at Law

50 Leavenworth Street
Post Office Box 1110
Waterbury, CT 06721-1110
Telephone: 203 573-1200

5

13    Q. What is your understanding of that? What does
14    that mean?
15    A. I would leave that up to my attorney to do.
16    Q. Okay. Do you have any information yourself
17    about what is notification to the class?
18    A. I -- I can't answer that one. Specifically, I
19    cannot answer.
20    Q. Can you tell me yes or not, sir, if you have
21    any information?
22    A. No, I don't.
23    Q. You don't have any information?
24    A. No.
25    Q. Okay. Now, the last part of Paragraph 9 of
1    your affidavit which is Exhibit 2 says, While I remain
2    responsible for my pro rata share of all costs. Do
3    you see that?
4    A. Yes.
5    Q. What does that mean to you, sir?
6    A. It means that I would pay just what my portion
7    would be.
8    Q. Your portion of what?
9    A. Of the class action.
10    Q. All right. Do you have any idea what the
11    dollar amount of that might be?
12    A. I have no idea whatsoever.
13    Q. All right.
14    A. I do not.
15    Q. All right. And do you have an agreement with
16    your attorneys about that?
17    A. I don't recall.
18    Q. All right. And with respect to that agreement,
19    if you have one, would that also be in writing or not?
20    A. Like I said, I don't recall.
21    Q. Okay. Do you know what the words "pro rata"
22    that are in that Paragraph 9 mean?
23    A. No, I do not.
24    Q. Take a look at Paragraph 10 of your affidavit,
25    please, Mr. Petrolito. Do you see that?
1    A. Yes.
2    Q. All right. Was that one of the paragraphs that
3    you said were your words or not?

{N0714923}

6

CARMODY & TORRANCE ʟʟᴘ   50 Leavenworth Street
Attorneys at Law   Post Office Box 1110
   Waterbury, CT 06721-1110
   Telephone: 203 573-1200

4       MS. FAULKNER: He did say that

5       paragraph -- the whole paragraph, excuse me,

6       the whole exhibit was drafted by his attorney.

7       THE WITNESS: Yes.

8       MS. FAULKNER: As is perfectly proper.

9       A.  I would say it was drafted by my attorney.

10      BY MS. RUBIN:

11      Q.  And -- all right.  Okay.  And why don't you

12      read the first part of Paragraph 10 to yourself,

13      please.

14      A.  I believe I've answered it to the best of my

15      ability.

16      Q.  And Paragraph 10 says, quote, I understand that

17      courts have sometimes awarded people money for serving

18      as class representatives.  That's the first part of

19      Paragraph 10.  Right?

20      A.  Uh-huh.

21      Q.  Do you expect to receive an award of money in

22      this case because of your serving as a class

23      representative?

24      A.  I'm not sure what the question is supposed to

25      mean.

1       Q.  Do you expect that because you are asking to be

2       the class representative in this case -- in this case

3       that you will receive an award of money?

4       A.  No, I don't.

5       Q.  All right.  Do you believe that you're entitled

6       to any money as a result of serving as a class

7       representative if you are approved by the court in

8       this case?

9       A.  Yes, I do.

10      Q.  And why do you think so?

11      A.  I'm at a loss for words.  I will leave that to

12      my attorney to answer.

13      Q.  All right.  Do you have any opinions yourself

14      about why you think you would be entitled to an award

15      of money under the circumstances?

16      A.  Well, because -- because I -- I'm not the only

17      one that's been wronged by Arrow Financial.

{N0714923}

CARMODY & TORRANCE LLP     50 Leavenworth Street
Attorneys at Law                   Post Office Box 1110
                                        Waterbury, CT 06721-1110
                                        Telephone: 203 573-1200

7

In <u>Ruland v. General Electric Company</u>, 94 F.R.D. 164, 166-67 (D. Conn. 1982), Judge Burns upheld the recommended ruling of a Magistrate Judge which denied class certification, based in part on a finding that plaintiffs were not adequate representatives because "[n]one of them…have a realistic conception of the likely costs of what promises to be a protracted and expensive lawsuit." The court held:

> The record does not show who has paid the necessary expenses so far. E.g., <u>Elser v. Northrup Corp., 86 F.R.D. 20, 36 (W.D.Mo.1979)</u>. There is no telling analysis of plaintiffs' resources. There is no forecast, not even a guess, as far as this record shows, of the financial needs of the action and the funding sources to meet them. See A. Miller, An Overview Of Federal Class Actions: Past, Present, And Future 32-34 (Fed.Jud.Ctr.1977) (hereinafter, "Overview").
>
> Although plaintiffs have a keen interest in the outcome of this case, it is uncertain whether they have turned over responsibility to guide the action to their lawyers. Blind reliance, even on competent counsel, is insufficient. <u>In Re Goldchip Funding Co., 61 F.R.D. 592, 594-95 (M.D.Pa.1974)</u>. The due process interests of the absent class members require some restraint on the attorneys. Overview at 34.

Plaintiff's deposition testimony makes clear that Mr. Petrolito has no information about the financial requirements of the class action. His testimony also shows that he does not have sufficient control over class counsel to meet the test outlined in <u>Weber v. Goodman</u>, supra. In addition to Mr. Petrolito's testimony concerning the content of the affidavit he filed with the court, he testified that he brought this action based on conclusions that he reached after reading documents

{N0714923}

CARMODY & TORRANCE LLP
Attorneys at Law

50 Leavenworth Street
Post Office Box 1110
Waterbury, CT 06721-1110
Telephone: 203 573-1200

8

within the two weeks before his deposition, more than two years after this action was

filed.

| | |
|---|---|
| 18 | Q. Now, you've brought this lawsuit against Arrow |
| 19 | Financial Services. Correct? |
| 20 | A. Yeah. |
| 21 | Q. All right. Have -- withdrawn. And why did you |
| 22 | do that? |
| 23 | A. Why did I do that? |
| 24 | Q. Yes. |
| 25 | A. Because I believe that in the -- if I |

| | |
|---|---|
| 1 | understand it correctly, in the state of Connecticut |
| 2 | it's illegal for them to collect on a debt which they |
| 3 | paid -- which they bought. |

***

| | |
|---|---|
| 10 | Q. When did you reach the conclusion that you just |
| 11 | gave me, Mr. Petrolito? |
| 12 | A. I read certain documents. |
| 13 | Q. And when did you read those? |
| 14 | A. Probably within the last two weeks. |

Transcript at 22-24. The proposed class representative's testimony on all of the issues,

taken together, indicates that he is not an adequate class representative. Plaintiff's

agreement(s) with counsel may demonstrate further grounds to deny class

certification, and defendant's motion to compel production of this document is

pending.

{N0714923}

9

CARMODY & TORRANCE LLP    50 Leavenworth Street
Attorneys at Law              Post Office Box 1110
                            Waterbury, CT 06721-1110
                            Telephone: 203 573-1200

**III.     Plaintiff Is Not An Adequate Representative of a Class Because He Has No Actual Damages.**

Plaintiff's counsel and plaintiff himself have admitted that the named plaintiff made no payments to defendant, and has no claim for actual damages. Because plaintiff has no claim for actual damages, he is not an adequate representative of either an FDCPA class or a CUTPA class. Indeed, the named plaintiff's CUTPA claim is subject to dismissal, for failure to state a claim upon which relief can be granted. See C.G.S. §42-110g(a). To state a cause of action under CUTPA, plaintiff must demonstrate that he has suffered "ascertainable loss" caused by the conduct at issue. "[T]he ascertainable loss requirement is a 'threshold barrier' that must be satisfied in order to state a CUTPA claim." Maguire v. Citicorp Retail Services, Inc., 147 F.3d 232, 237 (2d Cir. 1998)(citation omitted). CUTPA's "ascertainable loss requirement is a threshold barrier which limits the class of persons who may bring a CUTPA action seeking either actual damages or equitable relief." Maguire, supra, quoting Hinchliffe v. American Motors Corp., 184 Conn. 607, 440 A.2d 810, 815 (1981). "In cases alleging a CUTPA violation arising out of unfair debt collection practices, courts in this district have required that the plaintiff demonstrate some loss, deprivation or injury in order to satisfy CUTPA's ascertainable loss requirement." Tragianese v. Blackmon, 993 F. Supp. 96, 100 (D. Conn. 1997)(citations omitted). Plaintiff has admitted that he has sustained no "ascertainable loss." Plaintiff therefore has no

{N0714923}
CARMODY & TORRANCE LLP
Attorneys at Law
50 Leavenworth Street
Post Office Box 1110
Waterbury, CT 06721-1110
Telephone: 203 573-1200
10

CUTPA claim as a matter of law.  Accordingly, plaintiff is not an adequate representative of the proposed CUTPA class.

## CONCLUSION

For all of the foregoing reasons, in addition to the reasons set forth in defendant's memoranda in opposition to class certification, plaintiff is not an adequate representative of the class he seeks to represent.  The court should therefore deny the motion for class certification.


THE DEFENDANT,
ARROW FINANCIAL SERVICES LLC


BY: _Ann H. Rubin_ _____

Ann H. Rubin
Federal Bar No. ct 04486
Carmody & Torrance LLP
50 Leavenworth Street
P.O. Box 1110
Waterbury, CT  06721-1110
(203) 573-1200
Its Attorneys


{N0714923}

CARMODY & TORRANCE LLP    50 Leavenworth Street
Attorneys at Law    Post Office Box 1110
Waterbury, CT 06721-1110
Telephone: 203 573-1200

11

## **CERTIFICATION**

This is to certify that a copy of the foregoing was mailed, postage prepaid, on the above-written date, to:

Joanne S. Faulkner, Esq.
123 Avon Street
New Haven, CT  06511

David A. Searles
Donovan Searles, LLC
1845 Walnut St., Suite 1100
Philadelphia, PA  19103

James A. Francis
Francis & Mailman, P.C.
Land Title Building, 19th Floor
100 South Broad Street
Philadelphia, PA  19110

*Courtesy Copy:*

Magistrate Judge Holly B. Fitzsimmons
United States District Court
District of Connecticut
915 Lafayette Boulevard
Bridgeport, CT 06604


Ann H. Rubin

{N0714923}

CARMODY & TORRANCE LLP
Attorneys at Law

50 Leavenworth Street
Post Office Box 1110
Waterbury, CT 06721-1110
Telephone: 203 573-1200

12

UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

- - - - - - - - - - - - - - - -x

LUCIANO PETROLITO, on behalf of  :

himself and others similarly  :

situated                             : CIVIL ACTION NO.

                                     : 3:02 CV

VS                                   : 00484(JCH)(HBF)

                                     :

ARROW FINANCIAL SERVICES, LLC   :

- - - - - - - - - - - - - - - -x


Deposition of LUCIANO PETROLITO taken pursuant the

Federal Rules of Civil Procedure, before Jacinda A.

Grigaitis, Licensed Shorthand Reporter #00381 and

Notary Public within and for the State of Connecticut,

held at the offices of Del Vecchio Reporting Services,

100 Pearl Street, 14th Floor, Hartford, Connecticut,

on February 25, 2004, at 10:07 a.m.


DEL VECCHIO REPORTING SERVICES, LLC
PROFESSIONAL SHORTHAND REPORTERS
117 RANDI DRIVE
MADISON, CT 06443
203 245-9583

HARTFORD                                        STAMFORD

A P P E A R A N C E S:


ON BEHALF OF THE PLAINTIFF:

JOANNE S. FAULKNER, ESQ.
123 Avon Street
New Haven, CT 06511


ON BEHALF OF THE DEFENDANT:

ANN H. RUBIN, ESQ.
Carmody & Torrance
195 Church Street
P.O. Box 1950
New Haven, CT 06509-1950

```
 1              S T I P U L A T I O N S

 2

 3       IT IS HEREBY STIPULATED AND AGREED by and between

 4    counsel representing the parties that each party

 5    reserves the right to make specific objections at the

 6    trial of the case to each and every question asked and

 7    of answers given thereto by the deponent, reserving

 8    the right to move to strike out where applicable,

 9    except as to such objections as are directed to the

10    form of the question.

11       IT IS HEREBY STIPULATED AND AGREED by and between

12    counsel representing the respective parties that proof

13    of the official authority of the Notary Public before

14    whom this deposition is taken is waived.

15       IT IS FURTHER STIPULATED AND AGREED by and

16    between counsel representing the respective parties

17    that the reading and signing of the deposition by the

18    deponent is waived ____, is not waived   x  .

19       IT IS FURTHER STIPULATED AND AGREED by and

20    between counsel representing parties that all defects,

21    if any, as to the notice of the taking of the

22    deposition are waived.

23       Filing of the Notice of Deposition with the

24    original transcript is waived.

25
```

```
 1            (Defendant's Exhibits 1 and 2 were marked for
 2                      identification.)
 3         L U C I A N O   P E T R O L I T O ,
 4    Residing at 36 Standish Street, Hartford, Connecticut,
 5    having first been duly sworn, deposed and testified as
 6    follows:
 7    DIRECT EXAMINATION
 8    BY MS. RUBIN:
 9       Q.   Mr. Petrolito, my name is Ann Rubin and I
10    represent Arrow Financial Services who is the
11    defendant in the lawsuit.  Okay.
12            MS. RUBIN:  Counsel, are we going to agree
13         to any stipulations?
14            MS. FAULKNER:  Yes.  I wanted to have this
15         objection to the notice of deposition marked.
16            MS. RUBIN:  Okay.
17            MS. FAULKNER:  Since I didn't have a
18         chance to get it to you before today.
19            MS. RUBIN:  All right.  Do you want to
20         mark that, Counsel?
21            (Plaintiff's Exhibit 1 was marked for
22                      identification.)
23            MS. RUBIN:  All right.  We marked as
24         Plaintiff's Exhibit 1, an objection to notice
25         of deposition submitted this morning by
```

1          Attorney Faulkner.  All right.

2              MS. FAULKNER:  And for the record,

3          Mr. Petrolito works nights so he should be home

4          in bed at this point and it is 10 p.m. in his

5          time frame.  So I ask you to be considerate of

6          the time frame.

7              MS. RUBIN:  Okay.  That's fine.  But I

8          also want to put on the record that the time

9          and place of the deposition was agreed to by

10          counsel.  Counsel -- and I guess I would ask

11          counsel and Mr. Petrolito, because of your work

12          schedule would you be more able to testify if

13          the deposition was taken at a different time?

14              MS. FAULKNER:  I think we had earlier

15          mentioned 9 o'clock as a preferred time, but I

16          just wanted to let you know that he may be

17          tired.

18    BY MS. RUBIN:

19      Q.  I guess I'll start by asking the witness,

20    Mr. Petrolito, do you feel that you're able to testify

21    under oath at this deposition given your work schedule

22    and the fact that it's shortly after 10 a.m.?

23      A.  I'm able to testify.  If there's something that

24    I don't agree with or don't understand, I will make

25    that...

1    Q.  If at any point during the deposition you feel

2  that you are too tired to -- to completely and

3  truthfully testify under oath, I ask that you let me

4  know that.  Okay?

5    A.  Okay.

6          MS. RUBIN:  All right.  Counsel, are you

7        prepared to agree to any stipulations with

8        respect to the deposition?  By that I refer to

9        stipulations that customarily apply in this

10       district to depositions?

11         MS. FAULKNER:  They automatically apply so

12       I don't think they are subject to agreement.  I

13       think we do want to read and sign.

14         MS. RUBIN:  Fine.

15 BY MS. RUBIN:

16   Q.  Mr. Petrolito are you currently taking any

17 medications?

18   A.  No.

19   Q.  All right.  Is there any reason that you're

20 aware of that you can't testify truthfully and

21 accurately here today at this deposition?

22   A.  Not that I'm aware of.

23   Q.  All right.  Mr. Petrolito, I'm going to show

24 you a document that we've marked Defendant's Exhibit 1

25 for this deposition.  And you don't have to memorize

```
1    it, but I'd like to ask you if you've ever seen that
2    document or a copy of that document before?
3              MS. FAULKNER:  All right.  The answer --
4       A.   Yes, I have.
5              MS. FAULKNER:  I did not provide you with
6         a full copy.
7       A.   Yes, I have.
8    BY MS. RUBIN:
9       Q.   What -- what -- have you seen -- take a look at
10   the pages, and then if you would let me know have you
11   seen all of the pages of that document before or only
12   certain of them?
13      A.   All of that.
14      Q.   You've seen all of that?
15      A.   Yeah.
16      Q.   Okay.  And calling your attention to page 3 of
17   the Defendant's Exhibit 1 deposition notice, have you
18   specifically seen that page before?
19      A.   Yes, I have.
20      Q.   All right.  And did you understand that that
21   document asked you to bring certain papers or
22   documents with you here today?
23              MS. FAULKNER:  We have -- this is
24         Plaintiff's Exhibit 1, our objection to
25         bringing any documents here today.  So we did
```

1          not bring any documents here today.

2              MS. RUBIN:  But my question to the witness

3          was:  Did you understand, sir, that you were

4          requested to bring certain documents today?

5     A.   No, I did not.

6  BY MS. RUBIN:

7     Q.   You didn't know that?

8     A.   No.

9     Q.   Okay.  Fine.  All right.  Now, who is your

10  attorney in this case?

11    A.   Joanne Faulkner.

12    Q.   Mr. Petrolito, your attorney reminded me and I

13  didn't put it on the record, I'm going to ask you some

14  questions here today, and the court reporter is here

15  to take down a transcript of all the proceedings.

16         In order to allow her to do her job and make a

17  clean written record, I would ask you to follow the

18  following ground rules, please.

19         The first is please let me finish my question

20  before you begin your answer because the court

21  reporter cannot take two people talking -- take down a

22  good record of two people talking at the same time,

23  please.  Okay?

24         And then the other thing is please answer your

25  questions with -- audibly so we can hear you and not

1   -- not just with a nod or a point because that is also

2   something that the court reporter can't make a record

3   of.

4       A.   I understand that.

5       Q.   Okay.   Thanks.   Do you have any other attorneys

6   in this case other than Attorney Faulkner?

7       A.   James Francis of Pennsylvania I believe and

8   Searles.

9               MS. FAULKNER:   S-e-a-r-l-e-s.

10  BY MS. RUBIN:

11      Q.   All right.   Do you have any written agreements

12  with Attorney Faulkner concerning her representation

13  of you in this case?

14      A.   Yes, I do.

15      Q.   All right.   Do you have one written agreement

16  or more than one?

17      A.   As far as I can recall Joanne Faulkner is only

18  it.

19      Q.   And you have a written agreement concerning

20  Attorney Faulkner's representation of you in this

21  case?

22      A.   Yes.

23      Q.   And do you have a copy of that agreement?

24      A.   No, I do not.

25      Q.   You don't have it with you here today?

```
 1      A.   I don't have it with me, no.

 2      Q.   Do you have a copy of that agreement at home or

 3   somewhere else?

 4      A.   I do not recall.  I may have.  I do not recall.

 5      Q.   All right.  Before coming here today, did you

 6   check to see if you had a copy of a fee agreement with

 7   Attorney Faulkner?

 8      A.   No, I did not.

 9      Q.   All right.  Did you understand, sir, that we

10   requested that you bring a copy of that with you

11   although your attorney has filed an objection?

12      A.   No, I did not.

13      Q.   Okay.  Do you have -- question withdrawn.   Do

14   you have more than one written fee agreement or

15   written agreement with Attorney Faulkner concerning

16   this case?

17              MS. FAULKNER:  Asked and answered.

18              MS. RUBIN:  Your attorney has a right to

19         make objections, Mr. Petrolito, but in almost

20         every case you still need to answer the

21         question.

22      A.   I do not recall.  I do not recall.

23   BY MS. RUBIN:

24      Q.   You don't recall if you have more than --

25      A.   I have one written agreement with Joanne
```

DEL VECCHIO REPORTING SERVICES, LLC

```
 1    Faulkner.  I don't remember -- I don't know of any
 2    others.
 3        Q.  Okay.  Do you have a written agreement with
 4    Attorney Searles concerning this case?
 5        A.  I do not recall.
 6        Q.  What about Attorney Francis, do you have a
 7    written agreement with him concerning this case?
 8        A.  I only know of Attorney Francis and the
 9    attorney from the deposition -- I mean from the
10    document.
11        Q.  Okay.  Do you recall signing the written
12    agreement that you believe you have with Attorney
13    Faulkner?
14        A.  No, I do not.
15        Q.  Is it possible that you signed a written
16    agreement with Attorney Faulkner?
17        A.  It's possible.
18        Q.  All right.  But it's possible, I take it from
19    your answer, that you may not have signed an agreement
20    with Attorney Faulkner concerning this case?
21        A.  That's also possible.
22        Q.  All right.  Do you remember, sir, signing any
23    written documents concerning this case?
24        A.  No, I don't.
25        Q.  Okay.  Now, you claim in this lawsuit that you
```

1    received some letter -- a letter or some letters from

2    Arrow Financial Services.  Correct?

3        A.  Yes.

4        Q.  Do you remember -- withdrawn.  How many letters

5    did you receive from Arrow Financial Services?

6        A.  I do not know where they're located, but I do

7    know of two.

8        Q.  Okay.  Do you know of any other letters that

9    you received from Arrow Financial Services?

10       A.  Other than the notification of the lawsuit, no.

11       Q.  Okay.  Do you have copies of the letters you

12   received from Arrow Financial?

13       A.  I have not been able to locate them.

14       Q.  Have you ever -- withdrawn.  When was the last

15   time you were able to locate the letters you received

16   from Arrow Financial Services?

17       A.  Sometime in 2002.

18       Q.  All right.  Did you ever give copies of those

19   letters to anyone else?

20       A.  I do not recall.  I -- no.  I don't recall.

21       Q.  Did you ever give copies of those to any of

22   your attorneys?

23       A.  I don't recall.

24       Q.  Do you believe you did give copies to your

25   attorneys?

1    A.   I believe I may have but I just do not recall.

2    Q.   All right.  And as far as you can remember you

3  received two letters from Arrow Financial Services?

4    A.   Yes.

5    Q.   All right.  Is it possible that you received

6  more than two?

7    A.   It's possible, but like I said, I don't recall.

8    Q.   Do you remember what either of the letters

9  said?

10    A.   A little more than two years, no, I don't.

11    Q.   Okay.

12    A.   Well -- no.  I'm sorry.  I don't.

13    Q.   Did you want to explain that?

14    A.   No.  I -- I don't remember.

15    Q.   All right.  Did you ever send anything in

16  writing to Arrow Financial Services?

17    A.   Yes.

18    Q.   What did you send, sir?

19    A.   A letter.

20    Q.   And when did you send that?

21    A.   I don't recall the actual date, but it was one

22  letter.

23    Q.   Do you remember roughly when you sent it?

24    A.   I just said I don't remember.

25    Q.   Do you remember what year you believe you sent

1   it?

2       A.   I believe 2002.

3       Q.   All right.  Do you have a copy of that letter?

4       A.   Yes, I do.

5       Q.   Okay.  Did you bring it here today?

6       A.   No, I did not.

7       Q.   What does that letter say?

8       A.   What does that letter say?

9       Q.   Yes.

10      A.   Well, basically that I was wrongfully treated

11  by Arrow Financial.

12      Q.   Why did you write that letter?

13      A.   Because I believe I was wrongfully treated by

14  Arrow Financial.

15      Q.   What -- withdrawn.  What -- question withdrawn.

16  Why is it that you believed you were wrongfully

17  treated by Arrow Financial?

18      A.   Because the transaction that they're talking

19  about was totally invalid.

20      Q.   Okay.  What transaction, sir?

21      A.   Credit card transaction.

22      Q.   Does that involve -- withdrawn.  Does that

23  transaction involve a credit card that was issued to

24  you; that is, your credit card?

25      A.   It was my credit card, yes.

1    Q.   It was?

2    A.   Yes.

3    Q.   Okay.  And when did you get the credit card

4  originally?

5    A.   The original date I do not remember, but

6  probably 2001.

7    Q.   All right.  Do you remember who issued the card

8  to you?

9    A.   It was either -- it was either Centennial or --

10  I don't remember the name of the other credit card --

11  credit card company but one of the two.  It's

12  basically I believe the same company.

13    Q.   And what -- withdrawn.  So you were issued a

14  credit card by either Centennial or another credit

15  card company.  Is that right?

16    A.   That's right.

17    Q.   And you think that was in what year?

18    A.   2001 I believe.

19    Q.   All right.  And had you requested that the

20  company issue the credit card to you?

21    A.   I had requested that the company issue the

22  credit card to me, but I was not told of the fees that

23  would be attached to that credit card.

24    Q.   Okay.  What fees are those?

25    A.   Well, application fees, activation fees, and

1    fees that I've never even heard about.

2        Q.   All right.   And I take it that at some point in

3    time the company that issued the credit card charged

4    some fees to you?

5        A.   Yeah.   They charged fees before I even had the

6    card activated.

7        Q.   Do you remember how much they -- withdrawn.   Do

8    you remember how much the credit card company charged

9    to you in the fees that you've just described?

10       A.   About $200 I would say or pretty close to it.

11       Q.   And how did you find out that the credit card

12   company was charging fees to you?

13       A.   When I went to use the card for the very first

14   time, being with my wife out, just having had dinner,

15   going home, stopping for gas, putting $20 of gas in

16   the vehicle and only finding out I only had $12 on the

17   card.

18       Q.   And how much did you think you had on the card?

19       A.   Well over 250, very close to 300.   That's what

20   it should have been.   That's not what it turned out to

21   be.

22       Q.   All right.  What did you do when you found out

23   about those charges that the credit card company had

24   put on your card?

25       A.   I made -- I made an effort to contact them.

DEL VECCHIO REPORTING SERVICES, LLC

1      Q.   How --

2      A.   I wanted to know why.  This particular credit

3   card, I was told one thing and something else

4   happened.

5      Q.   And were you able to reach the credit card

6   company about that?

7      A.   No.

8      Q.   You weren't.  Did you try to reach them by

9   phone?

10     A.   Yes.

11     Q.   Did you try to write to them?

12     A.   Yes.  Never got a response.

13     Q.   So what did you do, if anything, when you

14   couldn't reach the credit card company?

15     A.   Well, when I was contacted by them telling me

16   that the account was going to be closed, nothing.

17     Q.   And did the credit card company close your

18   account?

19     A.   They charted out the account.  That's what they

20   said they did.

21     Q.   Did they say that to you in a letter?

22     A.   Yes.  But I don't recall where the letter might

23   be, along with all the other letters we talked about.

24     Q.   Okay.  Do you recall the last time you saw that

25   letter from the credit card company?

1    A.   I just said I do not recall.

2    Q.   Did you have a copy of that letter that you got

3    from the credit card company at the time that you

4    brought this lawsuit?

5    A.   I'm not -- I'm not sure that I could even find

6    it now.

7    Q.   Have you looked --

8    A.   It's been -- it's been quite a while.

9    Q.   All right.  Have you looked for that letter?

10   A.   For that particular letter, no.  Maybe some of

11   the others I might have, but like I said, I have not

12   been able to locate them.

13   Q.   Okay.  Did you do anything after you received

14   notice from the credit card company that they were

15   going to close the account?

16   A.   I believe I just answered that question.  I

17   wrote one letter, and as I said before, I never got an

18   answer back.

19   Q.   All right.  And after that did you do anything

20   else?

21   A.   No.

22   Q.   Okay.  Do you have a copy of the letter that

23   you sent to the credit card company?

24   A.   I'm not sure.  I probably do not.  Not now.  I

25   don't -- like I said, I'm not sure.  I really don't

1   recall if I do or not.

2      Q.   Do you remember looking for that letter?

3      A.   No.  I did not look for that letter.

4      Q.   With respect to all these letters, the

5   different letters we've talked about, Mr. Petrolito,

6   was it your practice to keep copies of those kinds of

7   letters in a particular place?

8      A.   Well, I've been making it a practice, you know,

9   concerning certain documents, to put them on -- put

10  them on the computer so they can be retrieved when

11  necessary.

12     Q.   Okay.  When did you start with that practice?

13     A.   Probably my wife might have done that for me,

14  not necessarily me myself, but roughly about 2002,

15  just started keeping things in the computer, archives

16  and whatever.

17     Q.   The letter that you sent to the credit card

18  company, did you write that on a -- withdrawn.

19          The letter that you sent to the credit card

20  company, did you or your wife prepare that on a

21  computer?

22     A.   It might have been written -- it was written

23  freehand by me.

24     Q.   Okay.

25     A.   My wife may have wanted to touch it up and

20

```
1    maybe put it on the computer.  And if you don't mind
2    my saying this, maybe clean up the language a little
3    bit.  But I told her to leave it alone and she did.
4        Q.   As far as you remember, the letter that you
5    send to the credit card company was handwritten by
6    you?
7        A.   Right.  And it was the only one, and I never
8    got a response, like I said before.
9        Q.   And you testified a couple of minutes ago about
10   a letter that you -- withdrawn.  Just I want to make
11   sure I have it this right.  Did you testify earlier
12   that you had also send a letter to Arrow Financial
13   Services at some point?
14       A.   Yes, I did.
15       Q.   And was that letter also --
16       A.   That's on the computer.
17       Q.   That's on the computer?
18       A.   Yes.
19       Q.   So you have a copy of that letter on the
20   computer?
21       A.   Yes.
22       Q.   All right.  With respect to the credit card
23   that you were testifying about a minute ago, you used
24   the card.  Correct?
25       A.   Yeah.  I used the card one time.
```

1      Q.   And was that when you were making the purchase
2    of gas?
3      A.   Yeah.   That was the only time the card was ever
4    used.
5      Q.   All right.   And --
6      A.   It was never used again.
7      Q.   Did the credit card company ask you to pay for
8    certain charges on that credit card?
9      A.   Rephrase the question, please.
10     Q.   Well --
11          MS. FAULKNER:   He already testified that
12          the credit card put application charges and
13          activation charges on --
14     A.   If that's what you were getting to, yes.
15   BY MS. RUBIN:
16     Q.   So the credit card company asked you to pay the
17   charges that they had put on the card?
18     A.   In one letter that they sent, yes.
19     Q.   And did the credit card company also ask you to
20   pay for the charge that was put on the card by you
21   when you bought the gas?
22     A.   No.   Because the card was denied right there at
23   the gas station.
24     Q.   So you didn't charge the gas to the card?
25     A.   No.   No.   I paid for the gasoline in cash.

1    Q.   All right.   And did you ever make any payments

2    to the credit card company in connection with that

3    card?

4    A.   No.

5    Q.   Did you -- withdrawn.   Did you ever take any

6    legal action against the credit card company?

7    A.   Legal action?

8    Q.   Yes.

9    A.   No.

10    Q.   You never sued the credit card company?

11    A.   No.

12    Q.   Did you ever assert a claim against the credit

13    card company?

14    A.   No.

15    Q.   Did a lawyer ever assert a claim in your behalf

16    against the credit card company?

17    A.   No.

18    Q.   Now, you've brought this lawsuit against Arrow

19    Financial Services.   Correct?

20    A.   Yeah.

21    Q.   All right.   Have -- withdrawn.   And why did you

22    do that?

23    A.   Why did I do that?

24    Q.   Yes.

25    A.   Because I believe that in the -- if I

```
1    understand it correctly, in the state of Connecticut
2    it's illegal for them to collect on a debt which they
3    paid -- which they bought.
4       Q.  All right.  And -- is that a conclusion you
5    reached on your own or with the assistance with your
6    attorney?
7             MS. FAULKNER:  Objection.  Privilege.
8    BY MS. RUBIN:
9       Q.  Is that a conclusion that you reached on your
10   own?
11      A.  I stand by my attorney.
12      Q.  Your attorney is objecting to a portion of the
13   question, but I am permitted to ask you if that's a
14   conclusion that you reached on your own.  You can just
15   say yes or no.
16            MS. FAULKNER:  That is privileged.
17            MS. RUBIN:  Whether he reached the
18        conclusion on his own, Counsel, is privileged?
19            MS. FAULKNER:  Absolutely, yes.
20            MS. RUBIN:  I don't believe that.  The
21        question of whether he reached the conclusion
22        on his own is not privileged.  I think he can
23        answer that yes or no without invading the
24        privilege.  I propose that we take it one step
25        at a time.  I'm not asking him to disclose
```

```
 1              communications that he had with his lawyer.
 2                   MS. FAULKNER:   That's exactly what you're
 3              asking him to disclose.   A yes or no answer
 4              will disclose that no matter which way he
 5              answers.
 6                   MS. RUBIN:   When -- I'll withdraw the
 7              question, and we'll see if we can do it without
 8              creating an objection.
 9    BY MS. RUBIN:
10       Q.   When did you reach the conclusion that you just
11    gave me, Mr. Petrolito?
12       A.   I read certain documents.
13       Q.   And when did you read those?
14       A.   Probably within the last two weeks.
15       Q.   Okay.   Do you now have copies of any documents
16    relating to the credit card that you've talked about?
17       A.   Not that I've been able to find.
18       Q.   All right.   And just to confirm, are you aware
19    of any documents that you received from Arrow
20    Financial Services other than the two letters or two
21    documents that you testified about earlier?
22       A.   No.
23                   MS. FAULKNER:   He also testified earlier
24              that he got the lawsuit.   I really object to
25              you going around and around in circles on the
```

```
 1              same question again.
 2                   MS. RUBIN:  I'm trying to make sure that I
 3              understand precisely what the witness received
 4              and what he remembers.
 5     BY MS. RUBIN:
 6         Q.  Have you ever brought a lawsuit before,
 7     Mr. Petrolito?
 8         A.  No.
 9         Q.  Have you ever filed for bankruptcy?
10         A.  No.
11         Q.  And how about your wife, has she?
12         A.  No.
13         Q.  Has she ever brought a lawsuit?
14         A.  No.
15         Q.  The credit card that you talked about this
16     morning, was that issued just to you or was it also
17     issued --
18         A.  No.
19         Q.  -- to your wife?
20         A.  To me.
21         Q.  Just to you.  Okay.
22         A.  Yeah.
23                   MS. FAULKNER:  Wait until she finishes.
24                   THE WITNESS:  I'm sorry for interrupting
25              you.
```

```
 1              MS. RUBIN:  No problem.
 2    BY MS. RUBIN:
 3      Q.  I want to show you a document that I've marked
 4    Defendant's Exhibit 2 for this deposition and it's
 5    entitled Plaintiff's Affirmation in Support of Class
 6    Certification.
 7           My first question, Mr. Petrolito, is:  Have you
 8    ever seen that document before?
 9      A.  Yes, I have.
10      Q.  When did you see that before, sir?
11      A.  Probably just about a year ago is the first
12    time I saw it.
13      Q.  Did you write this document?
14      A.  No.
15      Q.  All right.  Are these your words in this
16    document?
17      A.  Not totally.
18      Q.  All right.  Which words are not totally yours?
19      A.  Well, up to -- up to here they're not mine.
20      Q.  Wait a minute.  Let's just say it so the
21    reporter can get it down.  You're pointing to
22    Paragraph 4?
23      A.  Up to Paragraph 4, yeah.
24      Q.  All the words before 4 are not yours?
25      A.  Right.
```

1    Q.  All right.  And then are there any other words

2    in this document that are not yours, sir?

3    A.  Yes.  5, 6, 7, 8, 9, 10, and 11.

4    Q.  And those words are not yours?

5    A.  No.

6    Q.  Okay.  Do you know whose words those are, the

7    ones that you've indicated are not yours?

8    A.  I would respectfully say more than likely my

9    attorney's.

10    Q.  Which attorney's?

11    A.  Joanne Faulkner.

12    Q.  All right.  Now, do you know what a class

13    action is?

14    A.  A class action -- from what I understand, a

15    class action is an action being brought by a person or

16    persons against a corporation.

17    Q.  Do you understand that this case, your case is

18    requested to be a class action?

19    A.  Yes.

20    Q.  All right.  And what does that mean to you in

21    your own words, Mr. Petrolito?

22    A.  What it means to me is there is -- would you

23    repeat the question, please?

24    Q.  Actually, I'm going to ask the young woman, the

25    reporter to read it back for us, so we'll get it

```
 1   right.
 2       (The requested portion was read back by the court
 3                          reporter.)
 4              MS. FAULKNER:  What does what mean?
 5              MS. RUBIN:  If you wouldn't mind reading
 6          back the prior question as well, that will help
 7          the witness understand it.
 8       (The requested portion was read back by the court
 9                          reporter.)
10   BY MS. RUBIN:
11       A.  Well, I guess it means that -- that there is --
12   there is enough people out there who have been
13   wrongfully, I say, damaged by not only Arrow Financial
14   but many others, and I'm willing to stand up for them.
15       Q.  Now, do you understand that if the court
16   certifies this as a class action, you would have
17   certain responsibilities?
18       A.  Yes, I do.
19       Q.  What do you understand that those
20   responsibilities are?
21       A.  Well, I would have to keep in touch with my
22   attorneys.  Any letter -- any letters or anything else
23   that might have to be written, I would instruct my
24   attorney to do what has to be done.
25       Q.  Any other responsibilities that you understand
```

1   you would have if you are a class representative?

2       A.   Well, basically I'm taking responsibility for

3   all of them.

4       Q.   Any other responsibilities, Mr. Petrolito, that

5   you understand you would have as a class

6   representative?

7       A.   I'm not sure.

8       Q.   Okay.  Can you think of anything else along the

9   lines of your responsibility that you are aware of?

10      A.   No, I can't.  No, I can't.

11      Q.   Okay.

12      A.   You heard that?

13      Q.   All right.

14      A.   I'm sorry.  I'm beginning to get a little

15  tired.

16      Q.   That's fine.  Are you too tired to proceed?

17      A.   Well, my eyes are beginning to droop which

18  tells me that, time out.

19           MS. RUBIN:  All right.  Let's stay on the

20           record.  I don't want to proceed with the

21           deposition if the witness is too tired to

22           proceed, and I'm happy to reschedule it at a

23           time -- and if it's at an odd hour, so be it --

24           when the witness is alert enough to testify.

25           MS. FAULKNER:  Well, you can't possibly

```
 1            have more than two or three more questions.
 2                 MS. RUBIN:  Well, I'm not sure how many
 3            more questions I have, but if the witness has
 4            volunteered --
 5                 THE WITNESS:  Let's put it this way, let's
 6            continue.  When I know positively sure I can't
 7            continue any longer, that's it.
 8                 MS. RUBIN:  All right.  I just, again,
 9            Mr. Petrolito, would tell you that I don't wish
10            to impose on you, and in fairness to everyone
11            here we need to ask you the questions when
12            you're alert enough to do it.  So if you become
13            tired and you don't feel you can fairly and
14            accurately answer the questions under oath,
15            please speak up as you just did and we'll
16            finish it up at a time when you are more
17            rested.
18                 THE WITNESS:  Understood.
19                 MS. FAULKNER:  I would ask that you focus
20            the deposition since we spent the first half
21            hour talking about some credit card which is
22            totally irrelevant to class certification.  And
23            this deposition is for the purpose of class
24            certification and that's the sole purpose.
25     BY MS. RUBIN:
```

1    Q.   Do you have any understanding, Mr. Petrolito,

2    of whether this case can -- withdrawn.  Do you have

3    any understanding of the rules about whether this case

4    could be dropped or discontinued under certain

5    circumstances?

6    A.   No, I do not.

7    Q.   You don't know anything about that?

8    A.   No.

9    Q.   Do you have any understanding of what -- what

10   would happen in this case if you decided for your own

11   reasons that you didn't wish to proceed?

12   A.   From what I understand, I would be just

13   basically responsible for my own proportion of

14   whatever the costs would be.  Other than that, I

15   don't -- I don't know anything else.

16   Q.   All right.  Do you have any understanding of

17   any rules that would apply in settling this case?

18           MS. FAULKNER:  You're really asking him

19           legal questions, Ann, he's not expected to know

20           answers to.  You can deal with me about

21           settlement.

22           MS. RUBIN:  I'm simply asking

23           Mr. Petrolito for his understanding.

24   A.   No, I do not.

25   BY MS. RUBIN:

DEL VECCHIO REPORTING SERVICES, LLC

1    Q.  You don't have any information about settling

2  this case?

3    A.  No.  No.

4    Q.  Do you believe, Mr. Petrolito, that if you

5  wished to settle your claim, you would be free to do

6  so?

7    A.  I do not wish to settle the claim.

8    Q.  And that's fine.  I'm not asking you that

9  question, though.  What I want to understand is do you

10  believe that if you wished to settle your claim, you

11  would be free to do so?

12    A.  I believe I would be, yes.

13    Q.  Okay.  Do you have any understanding as to --

14  withdrawn.  Do you have any understanding with respect

15  to the claims of other potential class members if you

16  at some point wish to settle your claim?

17          MS. FAULKNER:  I object to that question.

18          MS. RUBIN:  You can answer, sir.

19          MS. FAULKNER:  No, he is not going to

20        answer that.  It's too speculative and it is

21        compound.

22          MS. RUBIN:  So you're instructing the

23        witness not to answer?

24          MS. FAULKNER:  Yes.

25  BY MS. RUBIN:

```
 1      Q.  All right.  Do you believe, Mr. Petrolito, that
 2   if you chose to settle your claim, you would be free
 3   to do so?
 4            MS. FAULKNER:  You asked him that and he
 5            answered it.
 6   BY MS. RUBIN:
 7      Q.  All right.  Do you -- do you have any
 8   understanding, Mr. Petrolito, about the claims of
 9   other potential class members and what would happen to
10   those claims in the future?
11            MS. FAULKNER:  Once again, it's a compound
12            question.
13            MS. RUBIN:  You can answer it,
14            Mr. Petrolito.
15            THE WITNESS:  My attorney --
16            MS. RUBIN:  Are you instructing him not to
17            answer, Counselor?
18            MS. FAULKNER:  Ask him a question that is
19            not compound.  I don't want him to be confused.
20   BY MS. RUBIN:
21      Q.  Do you believe, Mr. Petrolito, that if you
22   chose to settle your claim there would be any
23   restrictions on your doing so?
24            MS. FAULKNER:  He already answered that
25            question.
```

```
 1              MS. RUBIN:  He answered a different
 2         question, Counselor.
 3    A.   I'm not sure.
 4  BY MS. RUBIN:
 5    Q.   Now, in your affidavit Paragraph 9 you said
 6  that you -- it says, quote, I have arranged for my
 7  attorneys to advance all costs.  That's quoting a part
 8  of Paragraph 9.  That's the first part.  Right?
 9    A.   Yeah.  I read that.  I've seen that.
10    Q.   And is that true?
11    A.   Yes, it is.
12    Q.   And how did you make that arrangement?
13    A.   Reached an agreement with my attorney.
14    Q.   Attorney Faulkner?
15    A.   Right.
16    Q.   And is that agreement in writing?
17    A.   I believe it is but I don't recall.
18    Q.   All right.  Describe for me what you believe
19  the arrangement is, please.
20    A.   I can't answer it.
21    Q.   Why not?
22    A.   I --
23              MS. FAULKNER:  Because the question was
24         too vague.  Why don't you ask him a specific
25         question.
```

DEL VECCHIO REPORTING SERVICES, LLC

1             MS. RUBIN:  Counsel, please let the

2        witness finish his explanation.

3    A.  I can't answer.

4    BY MS. RUBIN:

5    Q.  All right.  Do you have any information,

6    Mr. Petrolito, about what the arrangement is with your

7    counsel about costs in this case?

8    A.  No, I do not.

9    Q.  All right.  Paragraph 9 of your affidavit also

10   references the cost of notification of -- notification

11   to the class.  Do you see that part of 9?

12   A.  Yes, I do.

13   Q.  What is your understanding of that?  What does

14   that mean?

15   A.  I would leave that up to my attorney to do.

16   Q.  Okay.  Do you have any information yourself

17   about what is notification to the class?

18   A.  I -- I can't answer that one.  Specifically, I

19   cannot answer.

20   Q.  Can you tell me yes or not, sir, if you have

21   any information?

22   A.  No, I don't.

23   Q.  You don't have any information?

24   A.  No.

25   Q.  Okay.  Now, the last part of Paragraph 9 of

1  your affidavit which is Exhibit 2 says, While I remain

2  responsible for my pro rata share of all costs.  Do

3  you see that?

4      A.  Yes.

5      Q.  What does that mean to you, sir?

6      A.  It means that I would pay just what my portion

7  would be.

8      Q.  Your portion of what?

9      A.  Of the class action.

10     Q.  All right.  Do you have any idea what the

11 dollar amount of that might be?

12     A.  I have no idea whatsoever.

13     Q.  All right.

14     A.  I do not.

15     Q.  All right.  And do you have an agreement with

16 your attorneys about that?

17     A.  I don't recall.

18     Q.  All right.  And with respect to that agreement,

19 if you have one, would that also be in writing or not?

20     A.  Like I said, I don't recall.

21     Q.  Okay.  Do you know what the words "pro rata"

22 that are in that Paragraph 9 mean?

23     A.  No, I do not.

24     Q.  Take a look at Paragraph 10 of your affidavit,

25 please, Mr. Petrolito.  Do you see that?

1    A.   Yes.

2    Q.   All right.  Was that one of the paragraphs that

3    you said were your words or not?

4              MS. FAULKNER:  He did say that

5         paragraph -- the whole paragraph, excuse me,

6         the whole exhibit was drafted by his attorney.

7              THE WITNESS:  Yes.

8              MS. FAULKNER:  As is perfectly proper.

9    A.   I would say it was drafted by my attorney.

10   BY MS. RUBIN:

11   Q.   And -- all right.  Okay.  And why don't you

12   read the first part of Paragraph 10 to yourself,

13   please.

14   A.   I believe I've answered it to the best of my

15   ability.

16   Q.   And Paragraph 10 says, quote, I understand that

17   courts have sometimes awarded people money for serving

18   as class representatives.  That's the first part of

19   Paragraph 10.  Right?

20   A.   Uh-huh.

21   Q.   Do you expect to receive an award of money in

22   this case because of your serving as a class

23   representative?

24   A.   I'm not sure what the question is supposed to

25   mean.

1    Q.   Do you expect that because you are asking to be

2    the class representative in this case -- in this case

3    that you will receive an award of money?

4    A.   No, I don't.

5    Q.   All right.  Do you believe that you're entitled

6    to any money as a result of serving as a class

7    representative if you are approved by the court in

8    this case?

9    A.   Yes, I do.

10    Q.   And why do you think so?

11    A.   I'm at a loss for words.  I will leave that to

12    my attorney to answer.

13    Q.   All right.  Do you have any opinions yourself

14    about why you think you would be entitled to an award

15    of money under the circumstances?

16    A.   Well, because -- because I -- I'm not the only

17    one that's been wronged by Arrow Financial.

18    Q.   Okay.  All right.

19    A.   If that was the answer you were looking for,

20    that is the answer.  I'm not the only one that was

21    wronged by Arrow Financial.

22    Q.   And just so we're clear, which I think we --

23    Mr. Petrolito, I'm not looking for any certain answer

24    one way or the other.  I just want to find out what

25    your understanding is about some of the subjects in

1    this case and some of the subjects in the affidavit.

2    That's my only purpose in asking you these questions.

3    Okay.  Do you understand that?

4        A.  Yeah.

5        Q.  All right.  Have you been promised any money

6    for being the class representative in this case?

7        A.  No, I have not.

8        Q.  Have you been guaranteed any -- that you would

9    receive any money by serving as the class

10   representative?

11       A.  I have not.

12       Q.  You don't?

13       A.  No.  You can hear me?

14       Q.  Okay.  Your affidavit says that you're not

15   employed by your attorneys, Faulkner, Searles, or

16   Francis.  That's true?

17       A.  That's true.

18       Q.  And are you related to any of them?

19       A.  No, I'm not.

20       Q.  Do you believe that you would have any

21   obligation personally to pay any of your attorneys for

22   their work in this case?

23       A.  For my -- for my proportion, yes.

24       Q.  Have you made any arrangements for how you

25   would pay any fees or costs that you are responsible

1    for?

2        A.    No.    We have not or I should say I have not.

3        Q.    Do you have any arrangements with your

4    attorneys about your right to decide whether to accept

5    any settlement at any point in this case?

6        A.    No, I do not.

7        Q.    That's not part of whatever agreements you

8    have?

9        A.    No.

10        Q.    Do you believe that if a settlement were

11    reached that you thought was fair and reasonable, that

12    you would have the right to decide whether to accept

13    that or not?

14        A.    Yes, I do.

15        Q.    And do you believe that you would have that

16    right independently of whatever your attorneys

17    thought?

18        A.    I believe so.

19        Q.    Where do you work, Mr. Petrolito?

20        A.    I work for Peter Pan/Arrow.

21        Q.    What do you do?

22        A.    Bus driver.

23        Q.    And how long have you worked for them?

24        A.    Two years.

25        Q.    And you're married I take it from your earlier

```
1    comments?

2        A.   Yeah.

3        Q.   You live in Hartford?

4        A.   Yes, I do.

5        Q.   With your wife?

6        A.   Yes.

7        Q.   All right.   Did you go to school in this area?

8        A.   Some, yes.

9        Q.   What school did you go to?

10       A.   Bulkeley.

11       Q.   And how -- how much schooling did you attain?

12       A.   I did not graduate.

13       Q.   You didn't graduate from high school?

14       A.   No.

15       Q.   Do you remember how much -- withdrawn.   Do you

16   remember how long you attended Bulkeley High School?

17       A.   9th grade; 10th, half a year; and that was it.

18   I got out.

19       Q.   All right.

20       A.   Bad mistake, but I did.

21       Q.   How old are you, sir?

22       A.   55.

23       Q.   Do you know -- withdrawn.   Do you recognize the

24   name Attorney Risigliano (phonetic)?

25       A.   Yes, I do.
```

1      Q.   What does that name mean to you?

2      A.   That was the attorney that was working

3  originally for -- one of the attorneys that was being

4  sued by Joanne Faulkner.

5      Q.   Did you ever bring a lawsuit against Attorney

6  Risigliano?

7      A.   You would have to talk to my attorney about it.

8  I don't recall.

9      Q.   You don't know?

10     A.   I'm not sure.  I don't know.

11     Q.   All right.  Did you ever receive any --

12  withdrawn.  Have you ever -- withdrawn.  Do you know

13  if you still have any claim -- withdrawn.  You don't

14  have any information about whether you've ever sued

15  Attorney Risigliano?

16     A.   No.

17     Q.   All right.  Have you ever testified at a

18  deposition before?

19     A.   No.

20     Q.   Have you ever testified at a trial?

21     A.   No.

22     Q.   You said that Arrow Financial brought a lawsuit

23  against you for that credit card debt?

24     A.   Yes.

25     Q.   Did -- were you represented by an attorney in

```
 1   that case?
 2       A.   No, I wasn't at the time.
 3       Q.   Were you ever?
 4       A.   When the original suit was brought, no, I was
 5   not.
 6       Q.   All right.  What happened to that original suit
 7   as far as you know?
 8       A.   It was taken over by Attorney Faulkner.
 9       Q.   When was that?
10       A.   Sometime in 2002.
11       Q.   What are you asking the court for in your
12   lawsuit?
13       A.   I'm asking to recover money for the class.
14       Q.   Are you asking the court for recovery of money
15   for you?
16       A.   No.  I'm asking the court to recover money for
17   the class and to determine it a class action.
18       Q.   You're not asking the court for any money for
19   you?
20       A.   Not for myself, no.
21       Q.   Have you ever served as a class representative
22   in any other case?
23       A.   No.
24       Q.   All right.  Have you ever been convicted of a
25   crime that was punishable by imprisonment in excess of
```

44

1    one year?

2        A.    I'm not going to answer that.

3                MS. FAULKNER:   You can answer that.

4        A.    No.   I'm sorry.   Skip that.   No, I have not.

5                MS. RUBIN:   Your lawyer will explain to

6            you that there's a rule of evidence that

7            permits attorneys to ask those questions.

8            Please don't take any personal offense.

9                THE WITNESS:   I was about to, but no.

10    BY MS. RUBIN:

11        Q.    Have you ever been convicted of a crime that

12    involved dishonesty or false statement?

13        A.    No.

14        Q.    Did you ever receive any phone calls from Arrow

15    Financial Services?

16        A.    Yes.

17        Q.    When?

18        A.    Probably about 2002.

19        Q.    Did you receive one call or more than one call?

20        A.    I did not keep records but more than a couple,

21    let's put it that way.

22        Q.    Do you know who you talked to in any of those

23    calls?

24        A.    No, I do not remember.

25        Q.    Do you have any records that would allow you to

1    determine how many calls you received or when?

2        A.    No.

3        Q.    Have you looked for any such records?

4        A.    No.

5        Q.    Now, you indicated in your affidavit that you

6    understand that you might have to provide documents

7    for use in this case.  Do you remember saying that?

8        A.    Yeah.

9        Q.    And are you willing to do that?

10       A.    Whatever I can find.

11       Q.    Now, you say in Paragraph 8C of your affidavit

12   that the case can't be dropped or settled without

13   protecting the members of the class, 8, that's C.

14       A.    I'm not understanding.

15       Q.    8C.  Do you see that?

16       A.    Yes.

17       Q.    What does that mean?

18       A.    It means that it has to be fair, fair for

19   everyone involved in the class, not just me.

20       Q.    What would you do, Mr. Petrolito, if it was

21   fair for you but not necessarily for others?

22       A.    I would refuse it.  I would not accept it.

23       Q.    And how would you decide if it was fair for

24   others?

25       A.    How would I decide?

```
 1     Q.   Yes.

 2     A.   By conferring with my attorneys.

 3     Q.   And how else would you decide?

 4     A.   Again, I would -- you know, I would confer with

 5   my attorneys.  That's about the only answer I can

 6   give.  I'm beginning to get tired.

 7             MS. RUBIN:  Okay.  All right.  Well, given

 8        that the witness has indicated that he's tired,

 9        we'll adjourn the deposition for now and I'll

10        let you know, Counsel, whether we need to

11        continue it or not.

12             MS. FAULKNER:  I think you've finished

13        your questioning.  Adjourn it now.

14             MS. RUBIN:  I'm reserving the right to

15        bring the witness -- to reschedule it at a time

16        when the witness is not tired, given he was

17        frank enough to tell us when he was too tired

18        to continue.

19             Let's put on the record what we're going

20        to do with the three original deposition

21        exhibits.  Counsel, do you have a preference.

22             MS. FAULKNER:  No.

23             MS. RUBIN:  All right I'll retain

24        Plaintiff's Exhibit 1 and Defendant's Exhibits

25        1 and 2 for identification.
```

47

1              (There was a discussion held off the record.)

2                    MS. FAULKNER:   Please send us a copy.   We

3          will buy a copy to read and sign.

4              (The deposition concluded at 11:04 a.m.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1                    C E R T I F I C A T E

2

3        I, Jacinda A. Grigaitis, LSR, hereby certify that I

4   am a Notary Public, in and for the State of

5   Connecticut, duly commissioned and qualified to

6   administer oaths.

7        I further certify that the deponent named in the

8   foregoing deposition was by me duly sworn, and

9   thereupon testified as appears in the foregoing

10  deposition; that said deposition was taken by me

11  stenographically in the presence of counsel and

12  reduced to typewriting under my direction, and the

13  foregoing pages are a true and accurate copy of the

14  original transcript of the testimony.

15       I further certify that I am neither of counsel nor

16  attorney to either of the parties to said suit, nor am

17  I an employee of either party to said suit, nor of

18  either counsel in said suit, nor am I interested in

19  the outcome of said cause.

20       Witness my hand and seal as Notary Public this 29th

21  of February, 2004.

22

23

24        _Jacinda Grigaitis_
          Jacinda A. Grigaitis, LSR
25        Licensed Shorthand Reporter #00381
```

DEL VECCHIO REPORTING SERVICES, LLC

1                              INDEX

2

3    WITNESS                                        PAGE

4    LUCIANO PETROLITO

5        Direct Examination by Ms. Rubin           4

6

7

8                            EXHIBITS

9       Plaintiff's Exhibits Marked for Identification

10

11   EXHIBITS              DESCRIPTION            PAGE

12      1              Objection                  4

13

14      Defendant's Exhibits Marked for Identification

15

16   EXHIBITS              DESCRIPTION            PAGE

17      1              Notice of Deposition        4

18      2              Plaintiff's Affirmation     4
                       In Support of Class
19                     Certification

20

21

22

23

24

25

```
 1            I have read the foregoing 48 pages and
 2        hereby acknowledge the same to be a true and
 3        correct record of the testimony.
 4
 5
 6
 7                        _____
 8                        Luciano Petrolito
 9
10
11
12
13
14   Subscribed and Sworn to
15   Before me this____day of _____, 2003.
16
17
18   _____
19        Notary Public
20
21   My Commission Expires:
22
23
24
25
```

DEL VECCHIO REPORTING SERVICES, LLC

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

LUCIANO PETROLITO, on behalf of
himself and all others similarly situated,

     v.                         CASE NO. 3:02CV484 JCH

ARROW FINANCIAL SERVICES LLC.       June  , 2003

### PLAINTIFF'S AFFIRMATION IN SUPPORT
### OF CLASS CERTIFICATION

I, LUCIANO PETROLITO, under penalty of perjury, as provided for by the laws of the United States, 28 U.S.C. § 1746, declare that the following statements are true and correct to the best of my knowledge and belief:

1.     I reside in Hartford, Connecticut

2.     I am the plaintiff in this lawsuit.

3.     I understand that this lawsuit alleges that Arrow Financial Services LLC, violated the Fair Debt Collection Practices Act, 15 U.S.C. § 1692, *et seq.*  Arrow engaged in unfair or deceptive collection practices by seeking to collect on thousands of debts from Connecticut consumers which Arrow acquired after the debt became in default. I understand that state law makes it illegal for Arrow to collect on acquired debts because of the conditions of its state collection agency license.

4.     I am one of the Connecticut  individuals subjected to collection after Arrow acquired my credit card debt. Arrow began sending me letters and calling me in 2000 and filed suit against me in 2002.

5.    I understand that this lawsuit alleges claims on behalf of a class of people.

6.    I understand that a class action is a lawsuit brought by someone on behalf of a group of people who have been treated in the same illegal manner by the defendant.

7.    I am willing to serve as a representative of the class.

8.    I understand:

a.   That as class representative I have the responsibility to see that the lawyers prosecute the case on behalf of the entire class, not just myself;

b.   That I may have to testify at a deposition or trial and provide documents and information for use in the case;

c.   That the case cannot be dropped or settled without protecting the class members. This normally means that the other members of the class have to get a fair monetary settlement of their claims;

d.   That the court has to approve any settlement or dispositions of the case.

9.    I have arranged for my attorneys to advance all costs, including the cost of notification to the class, of this action while I remain responsible for my *pro rata* share of all costs.

2

10.    I understand that courts have sometimes awarded people money for serving as class representatives but that I am not entitled to such money as a matter of right, and that I have not been promised or guaranteed money for being the class representative.

11.    I am not employed by or related to my attorneys, Joanne S. Faulkner, David A. Searles, or James A. Francis. They will be paid as directed by the Court, if this case is successful, out of the defendant's assets or the funds recovered for the class.

I declare under penalty of perjury that the foregoing is true and correct.


Dated: June _10_, 2003                              LUCIANO PETROLITO

3