UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| **LUCIANO PETROLITO** )<br>**JOSEPH CRISCO** )<br>　　　　　Plaintiffs, )<br> )<br>　　v. )<br> )<br>**ARROW FINANCIAL SERVICES LLC** )<br>　　　　　**Defendant** )<br> ) | Case No. 3:02CV 484 JCH (HBF)<br><br>July 19, 2005 | |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR AWARD OF ATTORNEYS' FEES AND REIMBURSEMENT OF EXPENSES**

**I.    PRELIMINARY STATEMENT**

Plaintiffs Luciano Petrolito and Joseph Crisco, by counsel, hereby move for an award of attorneys' fees and costs to the firms serving as their counsel in this case. The motion is made pursuant to the common fund doctrine, in which a reasonable fee is based on a percentage of the value achieved for a class. *Blum v. Stenson*, 465 U.S. 886, 900 n. 16 (1984). This motion is also supported by the Fair Debt Collection Practices Act, 15 U.S.C. § 1692 *et seq.* ("FDCPA"). The FDCPA mandates the award of fees and costs "in the case of any successful action to enforce … liability" under the statute. 15 U.S.C. § 1692k(a)(3).

The Plaintiffs' Settlement Agreement with Defendant Arrow Financial Services LLC ("Defendant" or "Arrow"), executed as of March 31, 2005 (the "Settlement Agreement"), testifies to the eminent success of this litigation on behalf of Connecticut consumers. Plaintiffs have succeeded in creating a total aggregate benefit for the Class in an amount in excess of eleven million, five hundred dollars ($11,500,000). These benefits entitle Plaintiffs to an award of fees and costs as hereinafter described.

## II. FACTUAL BACKGROUND

### A. Procedural History

On March 20, 2002, Mr. Petrolito filed a complaint initiating class action litigation against Defendant Arrow Financial Services, LLC ("Arrow") in *Petrolito v. Arrow Financial Service LLC*, No. 3:02 CV 484 (District of Connecticut) brought pursuant to the FDCPA and the Connecticut Unfair Trade Practices Act ("CUTPA"). On September 26, 2002, Mr. Crisco commenced class action litigation pursuant to CUTPA against Arrow in *Crisco v. Arrow Financial Services LLC* in the State of Connecticut Superior Court for the Judicial District of New Haven, transferred on November 22, 2002 to the Complex Litigation Docket, Judicial District of Waterbury at Waterbury, Docket No. X02-CV-02-0175840S. The *Petrolito* case and the *Crisco* case are collectively referred to herein as the "Actions."

Plaintiffs asserted in the Actions that Arrow violated the FDCPA and CUTPA by purchasing and seeking to collect on numerous charged-off debts, telling Connecticut consumers and Connecticut courts that Arrow had purchased their debts. The Connecticut Consumer Collection Agency Act ("CCCAA") expressly prohibits debt collectors from attempting to collect or sue on the purchased or assigned accounts.[1] Plaintiffs asserted the same claim under both CUTPA and the FDCPA: that Arrow's collection efforts were illegal by reason of the prohibition of the CCCAA (CCCAA regulations include identical prohibitions as the applicable FDCPA prohibitions found in sections 1692e(2)(A), (5), (8), (9), (10) and 1692f(1)).

On April 26, 2002, Mr. Petrolito filed a Motion for Class Certification in the *Petrolito* case, seeking certification of a class of similarly situated Connecticut consumers with claims going

---

[1] CCCAA § 36a-805 provides, "No consumer collection agency shall: . . . (3) purchase or receive assignments of claims for the purpose of collection or institute suit thereon in any court."

2

back one year under the FDCPA and claims going back three years under CUTPA. Arrow opposed class certification and, on December 4, 2002, Arrow filed a Motion to Dismiss in the *Petrolito* case, which Petrolito opposed. On March 17, 2003, the Court denied without prejudice both the Motion for Class Certification and the Motion to Dismiss. On May 12, 2003, Petrolito renewed his Motion for Class Certification, which Defendant again opposed. On April 8, 2004, the Court entered an Order in the *Petrolito* case in which it granted plaintiff's Motion for Class Certification and certified Mr. Petrolito as class representative and his counsel as class counsel. *Petrolito v. Arrow Financial Service, LLC*, 221 F.R.D. 303 (D. Conn. 2004). The Court certified a class defined as a one year FDCPA and one year CUTPA class comprised of all Connecticut residents from who Arrow sought to collect on a debt which it had purchased or received assignment of after the debt had been written off by the original holder. *Petrolito*, 221 F.R.D. at 306.

In September 2004, the parties met with U.S. Magistrate Judge Fitzsimmons in an attempt to address a possible settlement of the Actions. The parties left that conference at an impasse, but counsel thereafter resumed discussions and negotiations continued from late 2004 through March 2005, when an Agreement of Settlement was finally documented and signed. As part of the overall settlement, Plaintiffs filed a Second Amended Complaint in the *Petrolito* action, adding the claims presently asserted in the *Crisco* case to the claims already pending in the *Petrolito* case, adding Joseph Crisco as an additional named plaintiff and class representative and amending the definition of the class to comport with the definition of the settlement class. Defendant stipulated to the amendment, which was granted. Should the Agreement of Settlement receive final approval from the Court, the parties will dismiss the *Crisco* case with prejudice.

On April 1, 2005, Plaintiffs filed their Motion for Preliminary Approval of Settlement

thereby presenting to the Court the proposed settlement which they believed to be fair, reasonable and adequate – and which avoided the ongoing expense and uncertainties of further litigation, trial and possible appeal. Following a hearing on the Motion via conference call among counsel and the Court on April 14, 2005, the Court entered an Order of Preliminary Approval on April 20, 2005.

According to the Affidavit of Michael Caines filed on _____, 2005, the approved notice was mailed to 42,580 individuals whose names were supplied by Defendant. Prior to mailing, the addresses of these Class members were updated by running them through the Postal Service's National Change of Address database. Notice was mailed on May 16, 2005.

Significantly, no Class member filed objections to the settlement. Only three (3) individuals requested exclusion from the Class.

B.   **The Settlement**

The essential terms of the settlement are set out in the Settlement Agreement preliminarily approved by this Court. The parties submit that the settlement is fair, reasonable and sound in light of the relevant facts, the applicable law, and the value of the settlement, economic, as well as non-economic, to the Class. Plaintiffs believe that the settlement is quite good for a number of reasons, including the fact that no reported class action cases have ever been brought or classes certified under the same theory in Connecticut. Elsewhere, plaintiffs could identify only one similar case. *Foster v. D.B.S. Collection Agency*, 2002 WL 484500 (S.D. Ohio Mar. 26, 2002).

The settlement provides substantial benefits to the Class in the following respects. First, Arrow has agreed to pay the following amounts:

(a)   the sum of Two Hundred Seventy-Five Thousand Dollars ($275,000.00) for the benefit of the approximately 4,600 members of the Class who paid all or part of a sum

4

demanded by Defendant during the relevant time period. Payment of such sum to members of the Class shall be made on a claims-made basis. Class members who submit valid and timely Claim Forms ("Claiming Class Members") shall share the sum on a *pro rata* basis in accordance with the amounts paid to Arrow by such member. Any unclaimed funds or uncashed checks shall not revert to Defendant, but shall be paid to a *cy pres* recipient.

       (b)    the sum of Five Thousand Dollars ($5,000.00) to each of the two Representative Plaintiffs, Mr. Petrolito and Mr. Crisco.

       (c)    Representative Plaintiffs' reasonable attorneys' fees as approved by the Court, not to exceed Two Hundred Thousand Dollars ($200,000.00), plus reasonable reimbursable expenses.

In addition to the payment of the sums described above, Arrow has also agreed as follows:

       (a)    to permanently forgive a sum equal to Twenty-Five Percent (25%) of the original account balance for the approximately 38,200 members of the Class who have not made a payment to Arrow on account of a debt at issue in the Actions. Arrow estimates that the value of that benefit is approximately eleven million dollars ($11,000,000.00).

       (b)    to satisfy any judgment obtained against a member of the Class on account of a debt described in the Complaints in the Actions. Plaintiffs will identify such members and Arrow agrees to share such information in its possession as will aid Plaintiffs in identifying such members, upon reasonable request of Plaintiffs. Upon such identification, Arrow will provide written satisfactions of judgment documents to Class Counsel, Joanne S. Faulkner, Esq., for filing of record.

    (c) within forty-five (45) days following the Effective Date, to instruct each of the credit reporting agencies to whom it reported any of the collection accounts which are the subject of the Actions to delete the accounts/tradelines from the Class members' credit files.

    (d) to close the accounts of the Representative Plaintiffs, and to take no further collection action with respect to those accounts.  Defendant will not sell or assign such accounts to any other entity.  Defendant will instruct each of the credit reporting agencies to whom it reported the Representative Plaintiffs' collection accounts to delete the accounts/tradelines from their respective credit files.

    (e) to pay all processing and administrative costs and expenses incurred in connection with the compilation of the Class list, printing, publishing and mailing of Notice to the Class, receiving and compiling claim forms, requests for exclusion and objections submitted by the Class, distribution of monies to the Class members, reporting to the Court and all other aspects of claims and settlement administration. All such duties were and, assuming final approval is granted, will continue to be handled by an independent, third party class action settlement administrator. The amount paid by Arrow for those services is expected to total approximately $60,000.

  Thus, the total aggregate benefit achieved for the Class, as outlined above, is in excess of $11,500,000.00.[2]

## III. LEGAL ANALYSIS

---

[2] This estimate is of the gross economic settlement value, which includes the costs of notice and claims administration as well as Plaintiff's attorneys' fees and costs.  Subtracting those amounts results in a net economic settlement value of approximately $11,240,000. Neither sum includes the value created by Defendant's agreement to satisfy judgments obtained against Class members or to credit reporting agencies to delete the accounts/tradelines from the Class members' credit files   In any event,  measured economically and/or with the intangibles of the equitable relief, the value achieved for the Class is substantial.

### A.     Plaintiffs' Success Entitles Class Counsel to the Requested Fee

Plaintiffs request an award of attorneys' fees in the amount of $200,000.00, plus reimbursable expenses in the amount of $1,703.82

Plaintiffs were undeniably successful in obtaining substantial economic benefits for the members of the Class. Plaintiffs have created a total aggregate value for the Class in excess of $11,500,000.00. Had Plaintiffs not accepted this settlement and instead proceeded to trial, there existed a material risk that Class members would have recovered less, or perhaps nothing at all. Given this success, Plaintiffs are entitled to a fee calculated as a percentage of the value created for the Class.

### B.     The Fee Requested is Reasonable Calculated as a Percentage of the Recovery for the Class

In 1984, the Supreme Court observed that "[i]n the calculation of attorney's fees under the 'common fund doctrine,' … a reasonable fee is based on a percentage of the fund bestowed on the class." *Blum v. Stenson*, 465 U.S. at 900 n. 16. Subsequently, the Second Circuit clarified its early preference for the lodestar method and approved the use of either the percentage-of-recovery method or the lodestar method in common fund[3] cases. *Goldberger v. Integrated Resources, Inc.,* 209 F. 3d 43, 47, 49 (2d Cir. 2003).

The percentage-of-recovery fee doctrine applies in both the obvious cases where a cash fund has been created, as well as in cases where a defendant's change in practice or agreement to bring its conduct into compliance creates or bestows an aggregated value to the class. *Oh v.*

---

[3]     The common fund doctrine holds that a litigant who creates, discovers, increases, or preserves a fund to which others also have a claim is entitled to recover litigation costs and attorney's fees from that fund. BLACK'S LAW DICTIONARY (8th ed. 2004); *see also Alyeska Pipeline Service Co. v. Wilderness Society*, 421 U.S. 240, 259 (1975) (describing history and function of the doctrine that plaintiffs' attorneys in class cases may be awarded fees from a common fund generated for the benefit of the class). *See generally*, NEWBERG ON CLASS ACTIONS, § 14.6 (4th ed. 2002).

7

*AT&T Corporation*, 225 F.R.D. 142 (D. N.J. 2004). In *Oh*, the federal court applied the percentage-of-recovery model in awarding counsel fees of $3,301,446.00 where the plaintiff obtained the defendant's agreement to bring its actions into compliance with a tariff that required the defendant to provide consumers with two directory assistance listings. While there was no cash fund created, the court found that the defendant's agreement to provide consumers with this service as well several other negotiated services, including a short term 1-800 directory assistance service, created an aggregate value to class members in the amount of $13 million. Based upon this value, among other things, the *Oh* court applied the percentage of recovery method and found that the request for counsel fees was appropriate on the basis that it amounted to 25.3% of the value created. *Oh*, 225 F.R.D. at 152. Here, counsel have both created both a cash fund, as well as the additional economic benefit of debt forgiveness for a total fund value in excess of $11.5 million.

Thus, the percentage-of-recovery method has become generally favored in cases involving a common fund, and is designed to allow courts to award fees from the fund in a manner that rewards counsel for success and penalizes it for failure. *Gwozdzinnsky v. Sandler Associates*, 159 F.3d 1346 (2d Cir. 1998); *In re Prudential Ins. Co. of Am. Sales Practices Litig.*, 148 F.3d 283, 333 (3d Cir. 1998), quoting *In re General Motors Corp. Pick-Up Truck Fuel Tank Prod. Liab. Litig.*, 55 F.3d 768, 821 (3d Cir. 1995). The percentage-of-recovery method has essentially supplanted the lodestar method in class action counsel fee jurisprudence. *Strougo v. Bassini,* 258 F. Supp. 2d 254, 262 (S.D.N.Y. 2003) (noting the problems encountered in the lodestar method, and observing that "the percentage method is consistent with and, indeed, is intended to mirror, practice in the private marketplace where contingent fee attorneys typically negotiate percentage fee arrangements with their clients."). *See also Maley v. Del Global Technologies Corp.*, 186 F.

8

Supp. 2d. 358, 370 (S.D.N.Y. 2002); *In re Lloyd's American Trust Fund Litigation,* 2002 WL 31663577 *26-27 (S.D.N.Y. Nov. 26, 2002); *In re American Bank Note Holographics, Inc.,* 127 F. Supp. 2d 419, 430-31 (S.D.N.Y. 2001); *In re Sumitomo Copper Litigation*, 74 F. Supp. 2d 393, 397 (S.D.N.Y. 1999) ("Courts increasingly have come to recognize the shortcomings of the lodestar/multiplier method as a universal rule of compensation"); *In re NASDAQ Market-Makers Antitrust Litigation,* 187 F.R.D. 465, 484 (S.D.N.Y. 1998) ("there is strong support for the percentage approach from district courts in this Circuit");*Chatelain v. Prudential-Bache Sec., Inc.*, 805 F. Supp. 209, 215 (S.D.N.Y. 1992) ("This Court declines to apply the lodestar method, and instead favors the use of the straight percentage of recovery method" awarding 28%). This trend is consistent with the long established notion that it is within a district court's broad discretion to determine the amount of a fee award. *See Goldberger,* 209 F.3d at 57.

In one percentage-of-recovery case, a district court criticized the lodestar method:

> The lodestar [approach] has come under attack recently, however. It may encourage attorneys to delay settlement or other resolution to maximize legal fees, and it places a great deal of pressure on the judicial system, as the courts must evaluate the propriety of thousands of billable hours…. The lodestar may also compensate attorneys insufficiently for the risk of undertaking complex or novel cases on a contingency basis.
>
> These flaws have led to the increased use of the percentage method, which permits courts to reward success and penalize failure more directly…. It is particularly appropriate in "common fund" cases such as this one, as it simply awards counsel some percentage of the settlement fund…. Also, this method theoretically aligns the interests of counsel and class more closely than does the lodestar method: a larger recovery with fewer hours expended benefits all parties. For these reasons, the Third Circuit has "now made it clear that district courts should apply the [percentage] method of calculating fees in common fund cases such as this one." …. Among its other commendable qualities is that it makes the number of attorneys involved in the case irrelevant….

*In re Ikon Office Solutions, Inc. Sec. Litig.*, 194 F.R.D. 166, 193 (E.D. Pa. 2000) (citations omitted).

Common fund jurisprudence teaches that some six factors are to be considered, both in common fund and lodestar cases, to result in the "key consideration" of "what is reasonable under the circumstances." *In re Visa Check/MasterMoney Antitrust Litig.*, 297 F. Supp. 2d 503, 521 (E.D.N.Y. 2003). These are (1) the time and labor of counsel; (2) the magnitude and complexities of the litigation; (3) the risk of the litigation; (4) the quality of representation; (5) the requested fee in relation to the settlement; and (6) public policy considerations. Additional factors could include (7) the amount of the value created and the number of persons benefited; (8) the presence or absence of substantial objections by members of the class to the settlement terms and/or fees requested by counsel *Gunter v. Ridgewood Energy Corporation*, 223 F.3d 190, 195 n.1 (3d Cir. 2000).

As set forth in the attached Declarations of counsel at Appendices 1-3, the number of hours devoted to this case by the three firms serving as Class Counsel total 398.71All things considered, the number of hours devoted to this case are sufficient that this factor supports the requested fee award. *See* MANUAL FOR COMPLEX LITIGATION (THIRD), § 24.121 at 207 (one purpose of the percentage method of awarding fees - rather than the lodestar method, which arguably encourages lawyers to run up their billable hours - is to encourage early settlements by not penalizing efficient counsel).

The second factor also supports approval. This case involves potentially quite complicated issues of liability and damages which, if pursued, would involve even more protracted litigation between the parties as to class certification and as to the merits of Plaintiffs' claims.

The third factor is the risk of the litigation. The parties were at odds over the merits of this cutting edge case, and both sides stood to lose. Plaintiffs have created a total aggregate value for the Class in excess of $11,500,000.00. Had Plaintiffs not accepted this settlement and instead

proceeded to trial, there existed a material risk that Class members would have recovered less, or perhaps nothing at all.

The fourth factor is the quality of the representation. The quality of representation is measured by "the quality of the result achieved, the difficulties faced, the speed and efficiency of the recovery, the standing, experience and expertise of the counsel, the skill and professionalism with which counsel prosecuted the case and the performance and quality of opposing counsel." *Ikon*, 194 F.R.D. at 194. Counsel have a wide range of experience in consumer class action litigation, as evidenced by the information set forth in their respective Declarations, attached hereto. Counsel have also been certified to represent consumer class actions many times, by this Court and others,[4] which is testament to their skill, expertise and reputation.

The fifth factor is the requested fee in relation to the settlement. The amount of the value created and the number of persons benefited supports the fee request. While this is not a

---

[4] *See, e.g., Macarz v. TransWorld Systems, Inc.,* 193 F.R.D. 46 (D. Conn. 2000); *Rivera v. Fair Chevrolet Geo Partnership,* 168 F.R.D. 11 (D. Conn. 1996); *Smith v. Tobin,* 3:02CV 473 (AVC); *Alter v. Regional Adjustment Bureau, Inc.,* 3:94CV473 (AWT); *Lopez v. Orlor, Inc.,* 3:95CV 1890 (PCD); *Reep v Barco Auto Leasing Corp,* 3:94cv 798 (JBA); *Shaw v Napoli Motors, In.l,* 3:96CV 538 (AWT); *Perry v. FleetBoston Financial Corp.*, 2005 WL 1527694 (E.D. Pa. June 28, 2005); *Beck v. Maximus, Inc.,* 2005 WL 589749 (E.D. Pa. March 11, 2005); *Orloff v. Syndicated Office Systems, Inc.,* 2004 WL 870691 (E.D. Pa. April 22, 2004); *Petrolito v. Arrow Financial Services, LLC,* 221 F.R.D. 303 (D. Conn. 2004); *Gaumer v. The Bon-Ton Stores*, C.A. No. 02-8611 (E.D. Pa. Dec. 30, 2003 ); *Wells v. Coldata, Inc.*, C.A. No. 02-6609 (E.D. Pa. Nov. 20, 2003); *Muse v. Dymacol, Inc.*, 2003 WL 22794698 (E.D. Pa. Nov. 7, 2003); *Street v. Portfolio Recovery Associates*, C.A. No. 01-3684 (E.D. Pa. July 30, 2003); *Piper v. Portnoff Law Associates, Ltd.*, 215 F.R.D. 495, 502 (E.D. Pa. 2003); *Bonett v. Education Debt Services, Inc.*, 2003 WL 21658267 (E.D. Pa. May 9, 2003); *Oslan v. Law Offices of Mitchell N. Kay,* 232 F. Supp. 2d 436 (E.D. Pa. 2002); *Samuel-Bassett v. Kia Motors America, Inc*., 212 F.R.D. 271 (E.D. Pa. 2002) (class certified for breach of warranty claims), *vacated on other grounds*, 357 F.3d 392 (3d Cir. 2004); *Saunders v. Berks Credit and Collections, Inc.,* 2002 WL 1497374 (E.D. Pa. July 11, 2002); *Oslan v. Collection Bureau of Hudson Valley*, 206 F.R.D. 109 (E.D. Pa. 2002); *Schilling v. Let's Talk Cellular and Wireless, Inc.*, 2002 WL 391695 (E.D. Pa. Feb. 6, 2002); *Colbert v. Dymacol, Inc.*, 2001 WL 34083813 (E.D. Pa. Oct. 2, 2001) (striking offer of judgment and granting motion for class certification), appeal dismissed as improvidently granted, 344 F.3d 334 (3d Cir. 2003) (unanimous *en banc* decision); *Fry v. Hayt, Hayt & Landau*, 198 F.R.D. 461 (E.D. Pa. 2000); *Smith v. First Union Mortgage Corp.*, 1999 WL 947398 (E.D. Pa. August 23, 1999); *Williams v. Empire Funding Corp*., 183 F.R.D. 428, 440 (E.D. Pa. 1998) (class certified for rescission claims under Truth in Lending Act).

"megafund"[5] case, it is nonetheless a substantial value achieved on behalf of the Class. Those members who care enough to participate and return claim forms will receive a significant benefit.[6] In fact, smaller funds logically require a higher percentage fee award, due to the perception that large percentages of very large settlements lead to windfalls for attorneys. *See In re Visa Check/Mastermoney Antitrust Litig.,* 297 F. Supp. at 521 (noting "inverse relationship" of large settlement to smaller percentage award); Third Circuit Task Force, 108 F.R.D. at 256 (recommending that percentage decrease as award increases). Consequently, settlements in the smaller range support higher percentages of awards. In the range of settlement value achieved here, a fee and costs award of 12% to 17% is well within the norm, *see Goldberger,* 209 F. 3d at 52-53, but significantly higher than Plaintiffs are requesting. In *Stroudo,* 258 F. Supp. 2d at 262, the court awarded 1/3, citing numerous authorities supporting awards ranging from 30% to 46%. *See also In re Gulf Oil/Cities Service Tender Offer Litig.*, 142 F.R.D. 588, 597 (S.D.N.Y. 1992) (30%). *See* chart summarizing settlement awards*, infra.*

The sixth factor is the public policy considerations. As noted earlier, there were no objections to the settlement, and no objections to Plaintiffs' fee request. This factor supports approval. Private attorneys must have an incentive to bring these FDCPA cases, which are, by definition, in the interest of the hapless and often helpless consumers who, as here, don't even

---

[5]    $100 million has been recognized as the "informal marker of a 'very large' settlement." *Ikon,* 194 F.R.D. at 195, quoting *In re Prudential*, 148 F.3d at 339.

[6]    Preliminary estimates of the amount recovered by Claiming Class Members, based on the Affidavit of Michael Caines, indicate that those members will recover on the average of approximately $862 each, though the actual amount will differ according to how much that member paid Arrow.

12

know they are being preyed upon.[7] "Private attorneys should be encouraged to take the risks required to represent those who would not otherwise be protected from socially undesirable activities like securities fraud." *Maley,* 186 F. Supp. 2d at 374 (awarding 33% of common fund). The reasonableness of the fee requested here is underscored by the fact that the fee application is an arm's-length negotiated term of the settlement, agreed upon by the parties <u>after</u> the overall agreement to settle the Actions. The lack of possible collusion is clear as Defendant had a "particular incentive to bargain hard to keep the fee low."[8] Under these circumstances, the Court should give great weight to the negotiated fee in considering the fee request.[9]

Therefore, when fees are negotiated: 1) <u>after</u> relief to the class was already determined, 2) the fee is <u>separate</u> from relief to the class and does not detract from the relief to the class, and 3) the relief to the class otherwise appears fair, the parties should be free to negotiate class counsel's compensation as is done in the free market. There is a presumption that settlement negotiations between and among experienced counsel have been conducted in good faith.[10] Moreover, the Court can make the common sense presumption that Defendant does not want to pay more than is fair and will not willingly do so.

---

[7] *See Weiss v. Regal Collections*, 385 F.3d 337, 345 (3d Cir 2004) (recognizing "explicit" congressional directive that FDCPA be enforced by private attorneys generals acting in a representative capacity).

[8] *Michels v. Phoenix Home Life Mut. Ins. Co.*, 1997 WL 1161145, *30, 1997 N.Y. Misc. LEXIS 652, at * 90 (Supreme Court, N.Y. County).

[9] *Id.*

[10] *In re Chicken Antitrust Litig.*, 560 F. Supp. 957, 962 (N.D. Ga. 1980).

In this case, Plaintiffs requests attorneys' fees of $200,000, which is less than 2% of the $11,500,000 value achieved for the Class, plus reasonable costs. The request constitutes a multiplier of approximately 1.34 of counsel's lodestar, discussed below.

Set forth below is a chart summarizing fee awards in some Second Circuit class actions in which the percentage-of-recovery method was used for settlements of more than $100 million. As noted earlier, with some exceptions, the lower the award to the class, the higher the percentage approved. Further, the lodestar multipliers approved in those cases are generally higher than that requested here.

| Case | Settlement | Fees as % of Recovery | Lodestar Multiplier |
|---|---|---|---|
| *Kurzweil v. Philip Morris Co.*, 1999 WL 1076105 (S.D.N.Y. Nov. 30, 1999). | $123.8 million | 30% | 2.46 |
| *In re Sumitomo Copper Litig.*, 74 F. Supp. 2d 393 (S.D.N.Y. 1999). | $116 million | 27.5% | 2.5 |
| *In re PaineWebber Ltd. P'ships Litig.*, 999 F. Supp. 719 (S.D.N.Y. 1998). | $200 million | 13% | 1.4 |
| *In re Baldwin-United Corp. Litig.*, 1986 WL 12195 (S.D.N.Y. June 27, 1986). | $183.8 million | 4.1% | 2 |
| *In re "Agent Orange" Prod. Liab. Litig.*, 611 F. Supp. 1296 (E.D.N.Y. 1985), *aff'd in part* 818 F.2d 226 (2d Cir. 1987). | $180 million | 6% | 1.25-1.75 |

Based on this sampling of cases, it would appear that Plaintiffs' requested percentage of 1.74% is at the lower end of the range of other awards approved by courts, even though the case at bar is not a "megafund" case. This supports the fee request.

14

In summary, Plaintiffs' request for an award of fees and costs calculated as a percentage of the value of the benefit achieved for the Class is reasonable under all the *Gunter* factors.

### C.    A Lodestar Analysis Confirms That the Fee Requested is Reasonable

Even if a plaintiff prevails under a statute that has fee-shifting provisions, an award of fees based on a percentage of the created common fund may nonetheless be employed in the court's discretion. *Goldberger,* 209 F.3d at 57. But a lodestar analysis is relevant in a common fund case because it may serve as a cross-check. *Strougo,* 258 F. Supp. 2d at

The lodestar and expenses for counsel here as described in counsels' respective Declarations is as follows: for Law Offices of Joanne S. Faulkner., 53343.50, reflecting 152.41 hours of attorney time, and costs of $ 662.26 (*see* Appendix 1); for Donovan Searles, LLC, $_68,809, reflecting over 143 hours of attorney and paralegal time, and costs of $738.21 (*see* Appendix 2); and, for Francis & Mailman, P.C., $27,419, reflecting over 103 hours of attorney and paralegal time, and costs of $303.35 (*see* Appendix 3). Time for all counsel totals $_149,571.50 and costs total $_1703.82 for a grand total of  $ 151275.32

#### 1.    Hourly Rates

The hourly rates for the firms of Plaintiffs' counsel are well within the range of what is reasonable and appropriate in their markets. See Declarations of counsel filed herewith. The hourly rates for the attorneys in the firms are the same as the regular current rates charged for their services in their standard non-class matters, including both contingent and non-contingent matters. There has not been any alteration or deviation from the firms' hourly rates to account for the added complexity or increased risk factor of this action. The attorneys concentrate their practice in the area of consumer protection litigation. The hourly rates are within the range

charged by attorneys with comparable experience levels for consumer class action litigation of a similar nature.

The history and biography of each firm is included in the Declarations.

### 2. Hours Expended

In support of this motion, the Plaintiffs have submitted many pages of detailed, contemporaneously produced time records specifying the date of work performed, the attorney performing the work, the nature of the work, the amount of time spent and the hourly rate charged for the tasks. Included in the time records are reasonable, albeit conservative, estimates of the time expected to be spent on the case after the date of this motion. This submission readily meets the requirement of the degree of specificity required of a party seeking attorneys' fees in a percentage-of-recovery case. *See Prudential*, 148 F.3d at 341-43 (district court found detailed time summaries unnecessary where it was merely using lodestar calculation to double check fee award). Counsel's submission also meets the requirements for a statutory fee-shifting award. *See Maywalt v. Parker & Parsley Petroleum Co.*, 963 F. Supp. 310, 312 (S.D.N.Y. 1997) (fees awarded at 33% of fund). The Declarations submitted herewith also set forth the basis for the division of labor among the firms and their efforts to litigate the case in an efficient manner. There was no time for which compensation is now requested in this case that was "excessive, redundant, or otherwise unnecessary." *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983). All the time submitted was reasonably necessary to achieve the successful outcome for the Plaintiffs and the Class

### 3. Lodestar Multiplier

A lodestar multiplier aims to account for the contingent nature or risk involved in a particular case and the quality of the attorneys' work. *In re Union Carbide Corp. Consumer*

*Prods. Bus. Sec. Litig.,* 724 F. Supp. 160, 164 (S.D.N.Y.1989).  Courts apply a multiplier to the lodestar calculation for any number of reasons, *e.g.*, to reflect the risk of nonrecovery; to act as an incentive for the bringing of socially beneficial litigation; or to reward counsel for an exceptional result.  *Id.*, citing *Prudential*, 148 F.3d at 340-41 (noting at n. 121, under Supreme Court precedent, that multipliers for risk or counsel's expertise require "particular scrutiny and justification").

In this Circuit, district courts have approved various multipliers. *See In re Nasdaq*, 187 F.R.D. at 489 (multiplier of 3.97, with the observation that "[i]n recent years multipliers of between 3 and 4.5 have become common");  *In re Union Carbide,* 724 F. Supp. 160, 170 (2.3 multiplier for steering committee, 1.5 for other counsel); *In re Warner communications Sec. Litig.*, 618 F. Supp. 735, 749 (S.D.N.Y. 1985, *Aff'd,* 798 F.2d 35 (2d Cir. 1986) (2.5 multiplier, citing cases ranging from 2.2 to 4.5); *Rabin v. Concord Assets Group, Inc.*, [1991-92 Transfer Binder] Fed. Sec. L. Rep. (CCH) ¶.96,471 (S.D.N.Y. 1991) (applying a 4.4 multiplier); *Roberts v. Texaco, Inc.*, 979 F. Supp. 185, 198 (S.D.N.Y. 1997) (5.5 multiplier or 16% of fund); *In re RJR Nabisco*, 1992 U.S. Dist. LEXIS 12702, at *15-16 (6 multiplier). Much higher multipliers have been awarded as well. *See, e.g.*, *Cosgrove v. Sullivan*, 759 F. Supp. 166-67 n.1 (S.D.N.Y. 1991) (multiplier of 8.74 based on $1 million fee against lodestar of $114,398); *In re Baldwin-United Corp. Litig.*, 1986 WL 12195 (S.D.N.Y. June 27, 1986) ($183.8 million settlement, $7.5 million in attorneys' fees, lodestar multiplier of 2, and fees were 4.1% of total settlement); *In re "Agent Orange" Prod. Liab. Litig.*, 611 F. Supp. 1296 (E.D.N.Y. 1985), aff 'd in part, 818 F.2d 226 (2d Cir. 1987) ($180 million settlement, $10.7 million in attorneys' fees, lodestar multiplier of 1.25 to 1.75, fees were 6% of settlement); *In re Sumitomo Copper Litig.*,  74 F.Supp.2d 393 (S.D.N.Y. 1999) ($116 million  settlement,  fees 27.5%  of settlement, 2.5 lodestar multiplier); Kurzweil v.

17

Philip Morris Co., 1999 WL 1076105 (S.D.N.Y. Nov. 30, 1999) $123.8 million settlement, fees 30% of settlement, 2.46 lodestar multiplier); *In re PaineWebber Ltd. P'ships Litig.* 999 F. Supp. 719 (S.D.N.Y. 1998) ($200 million settlement, fees 13% of settlement, 1.4 lodestar multiplier); *In re Avon Prods. Inc. Sec. Litig.*, [1992 Transfer Binder] Fed. Sec. L. Rep. (CCH) ¶97,061, at 94,701 (S.D.N.Y. 1992) (the court awarded 30% in fees because that was "in line with numerous awards in this court and elsewhere in recent litigation" and because the 30% award was equivalent to a 2 or 3 multiplier under the lodestar analysis).

Here, the resulting multiplier of approximately 1.34 is at the lower end of the range of multipliers awarded by courts within the Second Circuit. *See also Maley v. Del Global Technologies Corp.*, 186 F. Supp.2d at 368-69 (finding a multiplier of 4.65 to be within the range in this Circuit).

Plaintiffs submit such a multiplier is appropriate in this case. Counsel has undertaken important consumer protection litigation that "addresses important consumer concerns that would likely be ignored without such class action lawsuits [and] must be encouraged." *Perry v. Fleet Boston Financial Corp.*, 2005 WL 1527694 at *16 (finding a 1.5 multiplier warranted). *See also Stoner v. CBA Information Services*, 352 F.Supp.2d 549 (E.D. Pa. 2005) (awarding Plaintiffs' Pennsylvania *pro hac vice* counsel a 1.67 multiplier); *Yong Soon Oh v. AT & T Corporation*, 225 F.R.D. 142 (D.N.J. 2004) (court approved 2.15 multiplier for "socially useful litigation" resulting in increase in listings per directory assistance call to same area code).

    **4.**   **Costs**

The Declarations of counsel filed simultaneously herewith show that costs as set forth therein were incurred in the prosecution of this case. The bulk of those costs were for filings fees, depositions, legal research services, travel, messenger services, telephone calls and copying

charges for pleadings, documents, briefs. All of the costs were advanced by Plaintiffs' counsel and were necessarily incurred. Plaintiffs should be awarded the unreimbursed costs in full.

## IV. CONCLUSION

Under all the circumstances existing here, the request for fees and costs is more than reasonable. The Settlement Agreement represents an excellent outcome for Plaintiffs' claims. By agreeing to the settlement, Plaintiffs have assured that each Claiming Class Member will receive an average benefit of approximately $862, depending on their pro rata share of the $275,000. In addition, each of the 38,241 members with open accounts will receive a 25% reduction of the amount alleged to be owed, a value of around $11,000,000. Even assuming that Plaintiffs would prevail in a trial on the claims, a jury verdict could certainly yield less against Defendant, or perhaps no recovery at all.

For all the foregoing reasons, Plaintiffs request that they be awarded reasonable attorneys' fees in the amount of $200,000 and costs in the amount of $ 1,703.82

                        Respectfully submitted,

Date: July 19, 2005                    __/s/ **Joanne S. Faulkner**_
                                            Joanne S. Faulkner ct04137
                                            123 Avon Street
                                            New Haven, CT 06511-2422
                                            (203) 772-0395

**DONOVAN SEARLES, LLC**
David A. Searles, Esquire
1845 Walnut Street, Suite 1100
Philadelphia, PA 19103
(215) 732-6067

**FRANCIS & MAILMAN, P.C.**
James A. Francis
Mark D. Mailman
100 S. Broad Street, 19th Floor
Philadelphia, PA 19110

(215) 735-8600

Attorneys for Plaintiffs and the Class

Certificate of Service

I hereby certify that on July 19, 2005, a copy of foregoing Memorandum was filed electronically. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

                         ____/s/ Joanne S. Faulkner___
                              JOANNE S. FAULKNER ct04137
                          123 Avon Street
                          New Haven, CT 06511-2422
                          (203) 772-0395
                          j.faulkner@snet.net